UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
In re
JOE'S FRIENDLY SERVICE & SON, INC.,
d/b/a THATCHED COTTAGE AT THE BAY,

Chapter 7
Case No. 8-14-70001-reg

                    Debtor.
--------------------------------------------------------------x
In re
THATCHED COTTAGE LP,

Chapter 7
Case No. 8-14-70002-reg
(Jointly Administered)

                    Debtor.
--------------------------------------------------------------x
BETHPAGE FEDERAL CREDIT UNION and
BUSINESS SERVICES GROUP, LLC,

                    Plaintiffs,

        -against-

Adv. Pro. No.: 8-16-8035-reg

THE TOWN OF HUNTINGTON,
JOSEPH F. CLINE, INDIVIDUALLY,
RICHARD VACCHIO, INDIVIDUALLY, and
TERENCE "TERRY" MCNALLY, INDIVIDUALLY,

                    Defendants.
--------------------------------------------------------------x

## DECISION ON LIABILITY

This adversary proceeding comes before the Court in the jointly-administered cases of

Joe's Friendly Service & Son, Inc., d/b/a Thatched Cottage at the Bay ("Joe's Friendly") and

Thatched Cottage LP ("Thatched LP") (together, the "Debtors"). The Plaintiffs, Bethpage

Federal Credit Union ("BFCU") and its affiliate Business Services Group, LLC ("BSG")

(together, the "Plaintiffs"), assert constitutional due process and equal protection violations

pursuant to 42 U.S.C. § 1983, and state-law tort and negligence claims arising from the allegedly

improper "placarding" of the Debtors' property (the "Property") by the Town of Huntington (the "Town") and certain of its employees (the "Individual Defendants") (together, the "Defendants"), and the failure to remedy the consequences of their improper acts for almost a year and a half.

Plaintiffs allege that the Defendants' actions, effectively condemning the Property, were perpetrated as part of a scheme with the Debtors' former owner, Ralph Colamussi ("Colamussi") designed to interfere with the bankruptcy court-ordered auction sale of the Thatched Cottage catering hall and real property. The Town's role in this alleged scheme was the improper use of its enforcement powers to make the Property in the hands of a third-party purchaser economically unfeasible at the agreed upon contract price. The Town allegedly raised issues with the winning bidder at auction, including but not limited to, requiring a licensing agreement with respect to an alleged encroachment on Town property that had not previously been enforced as against Colamussi. The Town also raised structural concerns, brought to their attention by Colamussi on the verge of the sale closing, that had not been previously raised. While the Town was in active negotiations with the winning bidder to come to an agreement to remedy the alleged defects at the Property, the Defendants, with no prior notice given to the bankruptcy trustee, the winning bidder or BFCU who held the mortgage on the Property, effectively condemned the Property by posting the placard which prohibited any person from entering the building on penalty of $15,000 fine and/or six months imprisonment. To justify their actions, the Defendants' position is that, relying exclusively on engineering reports delivered to the Town by Colamussi, an emergency existed which required immediate action without notice.

Within a week after the placarding the winning bidder walked away from the sale and BFCU, as backup credit bidder was required by this Court's order to purchase the Property.[1] Plaintiffs assert that the Defendants' actions damaged them because they were unable to sell the Property for a period of almost two years, and then only for a price far below the original sale price and at a significant discount from BFCU's lien. Plaintiffs allege that the placarding of the Property was done without justification, without following proper procedure, and was done in order to further Colamussi's objective of preventing a sale to a third party.

After eighteen days of trial where the Court heard from ten witnesses and examined over 150 exhibits, the Court finds that the Plaintiffs have not proven that the Town's placarding of the Property was part of a scheme with Colamussi. The scheme alleged by the Plaintiffs hinges on Colamussi's connections with the Town: that his father, sister and sister-in-law all worked for the Town at different times; that the Thatched Cottage was an iconic catering facility at which many Town functions were held; and that Colamussi was well-known in the community. All of this may be true, but the record does not support a finding that the Defendants' actions were undertaken as part of a conspiracy with Colamussi to interfere with the court-ordered sale of the Property. The Plaintiffs' argument is largely predicated on the theory that the Defendants' primary goal was to assist Colamussi in a scheme to keep ownership of the Thatched Cottage and their actions should be viewed through that prism. However, the record demonstrates that the Defendants were in fact primarily concerned with remedying problems at the Thatched Cottage that they were previously aware of and did little to nothing to solve. Having an opportunity to address these issues with the change of ownership, the Defendants acted. It is the total disregard for the rights of these Plaintiffs that is the issue before this Court.

---

[1]      BSG is an entity affiliated with BFCU which took title ownership of Property.

The record does support a finding that the Defendants' actions were motivated by their desire to force the prospective purchaser to cure alleged infirmities at the Property that existed long before the auction sale of which the Town was fully aware for at least one year prior to the placarding. It is clear to the Court that the Defendants placarded the Property when they did, regardless of the safety of the structure, to ensure the remediation of these alleged deficiencies before any new owner of the Property could operate a business at that location. Whatever the Court may feel about such behavior, that is not the issue to be resolved in this case. What is before the Court is whether the Defendants' conduct violated Plaintiffs' constitutional rights.

There is no dispute that the Defendants placarded the Property without prior notice. It is clear from the record that the Defendants failed to follow proper procedures established in the Huntington Town Code prior to placing the placard. The Defendants' excuse for not providing notice, *i.e.,* that the condition of the Property presented an immediate danger to the public safety, is not borne out by the facts: the Property was fenced at the time of the placarding; the catering facility was closed; the Town had inspected the Property and issued an assembly permit for the Thatched Cottage only three months prior to the placarding; and there was a two-day delay between deciding to placard the property and the actual placarding, which belies any claim of emergency, and during which time notice of the intention to placard could surely have been given. These facts clearly demonstrate that there was no emergency.

Also, some aspects of the Defendants' decision defy logic. The basis for the Defendants' actions was the receipt by the Town of engineering reports given to them by Colamussi, who they believed at the time to be the owner of the Property, showing the building was unsafe. At no time did they question why Colamussi would present the Town with reports showing that the building was unsafe, nor did they inquire as to who the reports were prepared for or for what

purpose. Also, the author of the engineering report upon which the Defendants apparently relied the most was an engineer with whom they had little, if any, familiarity. This Property was but a few miles from Town Hall yet no one from the Town conducted an independent inspection of the Property to confirm the conclusions contained in those reports. There appears to have been little to no discussion among the Individual Defendants of the proper Huntington Town Code procedures to follow prior to placarding, and the form of the placard and the reference to the applicable legal precedent was haphazard at best. Finally, presented with a situation that, according to their own testimony, they had never encountered before, no one consulted with the Town Attorney to discuss proper procedures to follow prior to placarding.

In the end, however, it is the Defendants' failure to follow the Town's own processes put in place to satisfy constitutional due process requirements that require this Court to rule in favor of the Plaintiffs. The Court is being asked to excuse the failure to follow the law and the common sense of advising parties that have an interest in the subject property of the intent of the Town to effectively condemn the Property. The Defendants' position is that their actions were motivated by the responsibility they had to protect the residents of the Town of Huntington from what they concluded was a dangerous situation at the Thatched Cottage, *i.e.,* that they acted in the face of an emergency and therefore we should excuse whatever violations of the Plaintiffs' rights might have occurred. However, where the Constitution of the United States is concerned the ends do not justify the means.

It is disturbing that the Defendants seem to believe that exercising their power in this manner was a perfectly acceptable tactic in achieving goals they believed were in the best interest of the public. However, violating the rights of anyone should never be permitted as just another card in the arsenal of the government. The Court finds that the Defendants knowingly

violated the Plaintiffs' constitutionally protected rights and this should never be permitted to go unchecked.

For the reasons that follow the Court finds the Town, Cline and Vacchio are liable for violations of the Plaintiffs' due process rights as asserted in the fourth cause of action of the Amended Complaint. The Plaintiffs' claims for violation of their rights to equal protection (fifth cause of action) will be dismissed as against all Defendants as will the state claims asserted in the first, second and third causes of action of the Amended Complaint. All claims against McNally will be dismissed. This represents this Court's decision on liability. The trial will continue as to damages.

## THE PARTIES

Plaintiff BFCU, is a banking corporation organized and existing under the laws of the State of New York. Am. Compl., ECF No. 15, ¶1.[2] BSG, an affiliate of BFCU, is a limited liability company organized and existing under the laws of the State of New York. Am. Compl. ¶2. From March 15, 2011 to January 2, 2015, BFCU, held a mortgage on the Thatched Cottage Property. On, January 2, 2015, BSG became the owner of the Property having purchased it from the bankruptcy estate, as assignee of BFCU in its role as backup bidder at the bankruptcy auction.

The Town of Huntington is a municipality duly organized and existing in Suffolk County, under the laws of the State of New York. Joint Pretrial Mem., ECF No. 176, at 30, ¶2.

Defendant, Joseph F. Cline ("Cline") was the Director of Engineering for the Town of Huntington in 2014. He graduated from Rensselaer Polytechnic Institute in 1990 with a degree in engineering. After working at an engineering consulting firm for 20 years, he was hired by the

---

[2]        Unless otherwise noted, all ECF references in this Decision are to the Adv. Proc. No. 16-8035.

Town of Huntington in 2012. Cline, Tr. 30, Jan. 13, 2020. Initially he held the position of Deputy Director of Engineering Services. *Id.* at 31. He was promoted to Director of Engineering Services four months after he started and held that position until he left the employment of the Town in 2018. *Id.* at 30-34. As Director of Engineering Services, Cline oversaw the Engineering and Zoning Division, the Fire Marshal's Office, Dix Hills Water District, and the Building Department. *Id.* at 34. Cline's direct supervisor in 2014 was Deputy Town Supervisor Pat Del Col. *Id.* at 35.

Defendant Terence "Terry" McNally ("McNally") was the Chief Fire Marshal in 2014, and he reported directly to Cline. *Id.* at 34; McNally, Tr. 7-8, Jan. 15, 2020. McNally was hired by the Town in 1997 and held the position of Assistant Chief Fire Marshal until 2010 when he was promoted to Chief Fire Marshal. McNally, Tr. 7, Jan. 15, 2020. McNally was still employed by the Town in 2020 when he testified in this trial. *Id.*

Defendant Richard Vacchio ("Vacchio") was the Senior Building Inspector in 2014. Vacchio, Tr. 7-8, Jan. 16, 2020. He, like McNally, reported directly to Cline. Cline, Tr. 34, Jan. 13, 2020; Vacchio, Tr. 8, Jan. 16, 2020. Vacchio was hired by the Town in or about 1992 and was ultimately promoted to Senior Building Inspector in 2005. *Id.* at 7. In this role his responsibility is to "[o]rchestrate the inspections for nine other inspectors during the day, do inspections [himself] as well, handle any of the constituents that come in, assist the fire marshal, [and] anything else that comes up." *Id.*. Vacchio was still employed by the Town in 2020 when he testified in this trial. *Id.* at 6.

# FACTS

In July 1990, Ralph Colamussi ("Colamussi") the sole owner and principal of the Debtors, Thatched Cottage LP ("Thatched LP"), and Joe's Friendly Service & Son, Inc d/b/a Thatched Cottage at the Bay ("Joe's Friendly"), took ownership, jointly with his wife Rosemarie Colamussi, of certain real property located on the water at 445 East Main Street, Centerport, N.Y. and an adjacent parking lot (together, the "Property"). Ex. 2; Joint Pretrial Mem. at 31, ¶ 24.[3] In January of 1993, ownership of the properties was transferred into Colamussi's name only. Ex. 3. In November of 1998, Colamussi transferred the properties to Thatched LP. Ex. 4. A "waterfront" catering facility, Thatched Cottage at the Bay ("Thatched Cottage"), operated by the Debtor, Joe's Friendly, was located on the Property. Colamussi managed the operations of the Thatched Cottage for many years.

On March 15, 2011, four mortgages then encumbering the Property were consolidated to form a single lien in the principal amount of $5,500,000, and for valuable consideration Thatched LP executed a Mortgage Consolidation and Modification Agreement in favor of Plaintiff Bethpage Federal Credit Union ("BFCU"), which was duly recorded. Joint Pretrial Mem. at 33, ¶ 44.

On August 28, 2011 and October 29, 2012, respectively, Hurricane Irene and Superstorm Sandy made landfall in New York. Joint Pretrial Mem. at 33, ¶¶45-46. Following the storms, Colamussi obtained four (4) architect and engineer reports assessing the damage and recommending remediation. First, on November 27, 2012, Colamussi obtained an evaluation of the Thatched Cottage building from Edward A. Valeri RA, Architect ("Valeri Report"). Ex. D. The Valeri Report concluded that the storm "flooded the ground area about 4-5 feet affecting the

---

[3]         In this Decision, Plaintiffs' exhibits are numeric, and Defendants' exhibits are alphabetic.

bearing of the interior column allowing it to settle and create settlement. This in turn [caused] interior settlement and cracking." Ex. V.

Second, on February 7, 2013, Colamussi obtained an evaluation from Thomas D. Reilly, P.E. (the "Reilly Report"). Ex. D. The Reilly Report noted that the water level reportedly rose to 4 feet above the lower level dining room floor and in Reilly's opinion the storm damage "undermined the foundations and grade level patio on the north side of the building . . .." *Id.* Reilly observed "settling of the exterior walls and main floor roof levels[,]" that "the Lobby floor pitches down to the Northeast by approximately 3 [inches]," and that "the north exterior wall on the west end of the top floor moved outward by several inches at the top, requiring temporary shoring to be installed to re-support the roof and attic framing." *Id.* Reilly concluded by recommending ways to re-support the settled portions of the foundation. *Id.*

Third, on February 15, 2013, Luigi Pascarella, P.E., PLLC issued a structural inspection report to Colamussi specifically to determine whether the building sustained damages as a result of the wind associated with Superstorm Sandy ("Pascarella Report"). Ex. W. The Pascarella Report observed walls that were visibly out of plumb, doors out of alignment, a ceiling that was sagging and separated from the wall. *Id.* The Pascarella Report concluded that the structure sustained this damage as a result of Superstorm Sandy and recommended repairs to certain areas of the roof, ceiling, walls. *Id.*

Finally, on March 13, 2013, John F. Capobianco Architect, PLLC, issued a letter report based on a December 18, 2012 inspection of the Thatched Cottage ("Capobianco Report"). Ex. D. Consistent with the Valeri and Reilly Reports, the Capobianco Report concluded that "the receding flood surge undermined the foundation and grade level of the patio area on the North side of the building, resulting in the settlement of the patio slab and its foundation, as well as,

major cracks in the exterior wall. The storm also impacted the North and East side of the main lobby area, resulting in settlement of the exterior walls, main floor, and the roof area. The lobby floor appeared to have settled approximately three inches and the North side of the building wall appears to have moved outward several inches at the top. This will require temporarily shoring up of the roof and attic framing." *Id.* The Capobianco Report recommended underpinning of the existing foundation and installation of bracketed helical piles in existing concrete to prevent further settlement. *Id.* The Capobianco Report also opined that "either the bulkhead needs to be raised a couple of feet or a seawall needs to be constructed along the North side of the building to prevent any further flooding." *Id.* (Together, the Valeri, Pascarella, Reilly and Capobianco Reports are referred to herein as "Colamussi Reports").

Colamussi retained Hoffman Grayson Architects LLP ("Hoffman Grayson") to ameliorate the flood damage and also to implement design alterations and additions to the Thatched Cottage to improve "functionality and aesthetics." Ex. L. On September 16, 2013, Hoffman Grayson wrote to the Town of Huntington's planning department on Colamussi's behalf outlining the scope of the alterations and requesting that the planning department forego the formal site plan application process and allow the building department to accept a building permit application for the proposed work. Ex. L.

On November 19, 2013, in a letter addressed to Hoffman Grayson, the Town, through Anthony J. Aloisio, Director of Planning & Environment ("Aloisio"), denied Colamussi's request to waive a formal site plan application. Ex. M. In so doing, Aloisio, on behalf of the Town, raised seven issues including concerns about the bulkhead and encroachments onto Town property. Specifically, the letter stated:

- The survey and site plan identifies numerous encroachments over the property line into the Mill Pond [Town property] [by] as much as 12 feet. . . The applicant

> should provide a license agreement with the Town of Huntington and hold
> harmless agreement during construction.
> - The integrity of the bulkhead should be reviewed by an engineer and DEC as the
>   bulkhead is constructed of creosote railroad timbers. The bulkhead appears to
>   have been constructed without permits.

Ex. M.

This letter was cc'd to, among others, Cline and his boss, Deputy Town Supervisor Patricia Del

Col. *Id.*

After his request to waive the site plan application was denied, Colamussi ultimately did

not proceed with the proposed renovations because the site plan process would have added a

prohibitive layer of expense, plus public hearings and input from the civic association. Breslin,

Tr. 112, Sept. 29, 2021. To this Court's knowledge, the issues raised in Aloisio's letter were not

addressed at that time, and the Thatched Cottage remained open for business. Breslin, Tr. 112-

113, Sept. 29, 2021.

In the meantime, on or about November 1, 2012, Thatched Cottage and Colamussi, as

guarantor, defaulted under the terms of the BFCU mortgage. Joint Pretrial  Mem. at 33, ¶49; Ex.

9. On March 21, 2013, BFCU sent Thatched LP and Colamussi a notice of default. Ex. CCCC.

On September 6, 2013, BFCU commenced a foreclosure proceeding. Joint Pretrial Mem., at 33,

¶50; Ex. 9.

On January 2, 2014, the Debtors, Thatched LP and Joe's Friendly, filed separate

bankruptcy petitions under chapter 11 of the Bankruptcy Code. The Thatched Cottage continued

operations during the bankruptcy under the management of Colamussi until April 1, 2014, when

the Court, at the request of the Debtors, approved the retention of Hospitality Credit, LLC

("Hospitality Credit") to manage the catering facility. Second Interim Order, dated April 1, 2014,

at 8, Case No. 14-70001, ECF No. 110. Gino Scotto ("Scotto"), the manager of Hospitality

Credit, agreed, simultaneous with the retention of Hospitality Credit, to provide debtor-in-

possession financing which included compensation for Scotto as the chief restructuring officer with the proposed reorganized debtor. Order, dated April 1, 2014, at 2, Case No. 14-70001, ECF No. 111. The original arrangement between Colamussi and Scotto, which did not ultimately come to fruition, was that Scotto would infuse up to $400,000 in debtor-in-possession financing in exchange for a 51% interest in a reorganized entity in which Colamussi would own 49%. Disclosure Statement, dated April 2, 2014, at 21-22, Case No. 14-70001, ECF No. 114. It was apparently Colamussi's goal to emerge from chapter 11 in partnership with Scotto.

On July 3, 2014, based on representations made to the Court on the record at a hearing on that date, this Court determined that a chapter 11 trustee should be appointed in the case as a result of issues raised about Colamussi's mental health and his fitness to manage the Debtors. Order, dated July 3, 2014, Case No. 14-70001, ECF No. 164. By notice dated July 4, 2014, R. Kenneth Barnard was appointed chapter 11 trustee (the "Chapter 11 Trustee"). Notice of Appointment, dated July 3, 2014, Case No. 14-70001, ECF No. 165.

On July 24, 2014, the Chapter 11 Trustee moved to sell the Property under § 363(b) of the Bankruptcy Code, which motion was granted and the auction was scheduled for September 24, 2014. Order, dated Aug. 11, 2014, Case No. 14-70001, ECF No. 210. The terms and conditions of sale included that the Thatched Cottage was to be sold "as is" "where is" and "with all faults." Ex. 18.

Although Scotto at some point decided not to pursue a bid to purchase the Thatched Cottage, it appears that he did commence some due diligence. Specifically, Scotto retained an engineer by the name of Richard Galli and Galli Engineering, P.C. to inspect the Thatched Cottage and prepare a report purportedly as part of Scotto's potential bid to purchase the

Property from the bankruptcy estate. Galli, Tr. 11-12, Nov. 9, 2021.[4] Galli inspected the property and issued an initial report dated July 29, 2014 ("First Galli Report"). Ex. 16. Similar to the Colamussi Reports, the First Galli Report found noticeable settling, walls out of plumb and undermining of the structure below the lobby area. *Id.* at 2. In addition, the First Galli Report added that "[d]ue to the fact that the facility receives high amounts of occupants injury and possible loss of life is a concern. It is clearly unsafe to have guests in the lobby until the structure has been rehabilitated." *Id.* at 10.

Galli testified that Scotto then asked him to re-inspect the property. Galli, Tr. 13-14, Nov. 9, 2021. He said that Scotto asked him to revise the First Galli Report to underscore the conclusion that the building was unsafe. Galli, Tr. 13-14, Nov. 9, 2021. The cover page to the Second Galli Report, defined below, states that "the purpose of the second inspection was to provide measurements of lean on various section [sic] of the north side wall." Ex. 16.  On August 15, 2014, Galli issued his second report which found that certain settling may have been produced by the undermining of the foundation ("Second Galli Report"). Ex. 16 at 4. (Together, the First and Second Galli Reports are referred to as the "Galli Reports"). The Second Galli Report cited safety concerns that the structure in the lobby area may "ultimately fail over time." Ex. 16 at 4. Galli testified that he gave the Galli Reports to Scotto only. Galli, Tr. 16, Nov. 9, 2021. He did not notify the Town of his safety concerns. Galli, Tr. 18, Nov. 9, 2021.

On June 3, 2014, only about eight weeks prior to Galli's first inspection, the Town, in its ordinary course, inspected the Thatched Cottage for purposes of issuing an assembly permit. Based on this inspection, an occupancy and assembly permit was issued on August 18, 2014,

---

[4]     For reasons unknown, Scotto directed Galli to reflect that the reports were prepared for "Manuel Varveris, Hamholding Corp." Galli had no relationship with Mr. Varveris. Galli, Tr. 55, Nov. 9, 2021.

allowing up to 831 persons to assemble at the catering facility. Ex. 17. This permit was signed by both McNally and Cline. Ex. 17. Cline testified that there was a certificate of occupancy for the building and that there were no fire code violations at the property on the date the permit was issued. Cline, Tr. 43-46, Jan. 13, 2020. McNally and Cline both testified that the June 2014 inspection would have been limited to fire safety issues, not the structural integrity of the building or any other non-fire code violations. McNally, Tr. 33-34, Jan. 15, 2020; Cline, Tr. 43-47, Jan. 13, 2020.

On September 23, 2014, the day before the auction sale, Colamussi attempted suicide.

The auction proceeded on September 24, 2014 and Yama Raj ("Raj") was the highest bidder at $4,650,000.[5] Joint Pretrial Mem. at 52, ¶15. BFCU credit bid in the amount of $4,600,000, and was deemed the second-highest bidder. Joint Pretrial Mem. at 52, ¶¶16-17. Pursuant to this Court's orders approving the bidding procedures and then approving the ultimate sale, BFCU became the back-up bid bound by the terms of sale and was legally required to close in the event of Raj's default. *See* Orders, dated August 11, 2014 and October 16, 2014, Case No. 14-70001, ECF Nos. 210 and 247. The sale was scheduled to close on November 24, 2014. Ex. EE.

The Thatched Cottage ceased operations on October 6, 2014.

On or about October 2, 2014, Raj reached out to Hoffman Grayson to help him interface with the Town regarding "alterations and eventual replacement of the Thatched Cottage." *See* Ex. H. On October 8, 2014, Neal Hoffman ("Hoffman"), representing Raj, emailed Steven Haber ("Haber"), an employee of the Town's Planning Department, inquiring as to whether the "minor renovations" Raj wanted to do would require "a whole site plan application." Ex. O. At that time,

---

[5] Raj's bid included a buyer's premium of $186,000 bringing the effective total sales price to $4,836,000. Ex. 18.

14

Hoffman represented to Haber that Raj's intentions were to just "fix up stuff now" and do a "complete redo in a couple of years." Ex. O. On October 9, 2014, Haber responded and reminded Hoffman that "there is [sic] a multitude of violations on the property, not to mention encroachments that were built without permits" that would need to be resolved "before any other permits can be issued and the site will require a site plan application" Ex. O. Haber scheduled a meeting between Raj and representatives of the Town for October 16, 2014. Ex. O. After the October 16th meeting, Haber emailed his colleague in the Town Supervisor's Office, Betty Walsh ("Walsh"), cc'd to Aloisio, and told Walsh he had met with "the new owners" of the Thatched Cottage and "they want to know what they have to do to open[.]" The email concludes by requesting a meeting with the Deputy Town Supervisor Patricia Del Col ("Del Col") "to discuss what the Town will require." Ex. Q.

A meeting was scheduled for October 28, 2014 between employees of the Town and Raj and his representatives. Ex. R. Hoffman suggested to Raj that he contact John Breslin for legal representation at the meeting. *Id.* The day before the meeting, Walsh emailed Hoffman a memorandum, drafted by Deputy Town Attorney, Thomas Glascock, with a list of sixteen discussion items. Ex. S. The memo, among other things, raised issues which were identical to the issues raised in the Town's November 19, 2013 letter to Hoffman when he was representing Colamussi in connection with his proposed, but ultimately abandoned, renovations to the Thatched Cottage. *Compare* Ex. M *with* Ex. S. Specifically, the overlapping issues related to encroachments on Town land, the bulkhead, environmental impact and traffic concerns. The memo did not mention any concerns about the structural safety of the current building or storm damage. Ex. S.

Hoffman responded to Walsh, in an email dated October 27, 2014, that Raj was interested in knowing "what agreement is necessary, if at all, that will allow them to reopen the previously operating facility with some necessary repairs, while the encroachments and Site plan items are being addressed." Ex. 23. Hoffman further explained that '[b]eing forced to keep the facility closed for an extended time will be economically infeasible." *Id.* Walsh forwarded Hoffman's response to Cline, Del Col, Haber, Glascock, and Aloisio. Ex. 24.

In attendance at the October 28, 2014 meeting were Cline, Glascock, Aloiso, Raj, Breslin (representing Raj), and Hoffman. According to Glascock, the meeting was focused on the decking encroachment. Glascock, Tr. 97, July 19, 2021. At conclusion of the meeting Glascock was tasked with drafting a license agreement which would permit Raj to use the encroachment and reopen the Thatched Cottage subject to certain conditions. Glascock, Tr. 162-63, Sept. 28, 2021.

Following the meeting, on October 29, 2014, Hoffman emailed Walsh stating: "I believe that [Raj is] now ready to proceed with in [sic] completing their contract, and to participate in returning the Thatched Cottage back to a viable venue." Ex. T. On November 11, 2014, an associate from Breslin's office reached out to Glascock asking about the status of the license agreement. Ex. U. Glascock responded on November 12, 2014 stating that he had prepared a draft document which was under review by "persons" at Town Hall. Ex. U.

On October 24, 2014, while these discussions were going on between Raj and his representatives and the Town, an anonymous letter was delivered to the Town Supervisor's Office from an entity called the Concerned Citizens of Centerport (the "First Concerned Citizens Letter"). Ex. 21. The First Concerned Citizens Letter stated that the author or author(s) had "many meetings in Town Hall with various Department Heads" regarding safety issues at the

Thatched Cottage and stated "[w]e must be still involved with the new owners on site Plan Review." Ex 21.

A second letter from the Concerned Citizens of Centerport, dated November 7, 2014 (the "Second Concerned Citizens Letter"), was received by the Town's engineering department on November 13, 2014. Ex. 25. This letter included a local news article questioning the structural integrity of the Thatched Cottage. *Id.* (Together, the First Concerned Citizens Letter and the Second Concerned Citizens Letter are referred to herein as "the Concerned Citizens Letters"). Cline testified that nothing was done to investigate the identity of the Concerned Citizens. Cline, Tr. 133, Jan. 13, 2020. The author(s) of the Concerned Citizens Letters remain anonymous.

On Thursday, November 13, 2014, Colamussi hand-delivered a package to the Town of Huntington Fire Marshal's Office. Joint Pretrial  Mem. at 55, ¶55. The package included the Galli Reports and the Colamussi Reports, as well as at least one of the Concerned Citizens letters. Cline, Tr. 58-59,111, 133, Jan. 13, 2020. While there, Colamussi spoke with McNally. McNally, Tr. 109, Jan. 15, 2020. McNally did not accept the package from Colamussi, but told him to leave it on the counter. Cline, Tr. 123, Jan. 13, 2020. Cline overheard the conversation between Colamussi and McNally (*Id.* at 114-15) and took the package after Colamussi left. Cline read the Galli and Colamussi Reports the morning of Friday, November 14, 2014. *Id.* at 146. The Galli and Colamussi Reports were circulated throughout the Town Supervisor's Office on Friday, November 14, 2014. *Id.* at 151-52.

Also on November 14, 2014, Raj became aware of the Galli and Colamussi Reports and the Concerned Citizens Letters. Ex. 104. After discussions with Cline, Hoffman informed Raj that in order to reopen the Thatched Cottage, Raj would have to retain an engineer. *Id.* At some point on November 17, 2014, Breslin advised Raj that according to Cline the Thatched Cottage

17

would not be permitted to reopen until an engineering report proved the Thatched Cottage was safe (the "Breslin Letter"). Ex. 33; Ex. WW. That same day, Raj commissioned an engineering report from the firm of Tauscher Cronacher ("Tauscher"). Ex. 34.

On November 18, 2014, Anthony Grieco ("Grieco"), an independent contractor working on behalf of Tauscher, inspected the Thatched Cottage. Ex. 39. Grieco drafted an initial report (the "Short Tauscher Report"), and Raj picked up that report on November 19, 2014. Ex. 34. The Short Tauscher Report lists observations[6] regarding the structural integrity of the Thatched Cottage which led Grieco to write "there are no indications of structural movement or instability caused by … [Hurricane] Sandy or other storms." Ex. 39. The Short Tauscher Report did note that "the leakage condition caused by the roofing and other problems need to be fully investigated, as to the extent of the damages, and properly and fully corrected at this time." Ex. 39. Grieco's notes and testimony indicate that he drafted a final report (the "Long Tauscher Report"), and that Raj received that report on November 20, 2014. Ex. 34. (Together, the Long Tauscher Report and the Short Tauscher Report are referred to herein as the "Tauscher Reports"). The Long Tauscher Report concluded that the Thatched Cottage is "in less than acceptable condition" and that it requires "considerably more renovation, rehabilitation and maintenance than most we examine." Ex. 39. There is no proof that the Tauscher Reports were shared with the Town prior to the placarding.

---

[6]    The Tauscher Report observed that: (1) "For the main and upper level floor areas, there are no distress cracks in the gypsum board joints between the ceilings and wall[] joints and in the wall surfaces. (2) In the basement area under the first floor area, where visible the foundation walls appear to be solid with no shifting of the building. (3) There were no indications of any roof structure damages or structural movement due to the storms. (4) The exterior walls are basically true and plumb with no racking observed." Ex. 39.

While Raj was working with Tauscher, Cline met with McNally and Vacchio sometime between 7am and 10am on Tuesday, November 18, 2014 to discuss the Galli and Colamussi Reports and what to do about them. Cline, Tr. 58-59, Jan. 13, 2020. The meeting lasted approximately 20 minutes. *Id.* at 58. According to Cline, the reports "seemed very serious, and we talked about the consequences of placarding versus doing nothing, and somebody getting hurt." *Id.* at 65. Cline felt he had "an ethical obligation as a professional engineer to do something about it and warn the public." *Id.* at 108. Cline knew at the time that the Thatched Cottage was closed for business. *Id.* at 61.

According to Cline at the conclusion of the 20-minute meeting, based solely on the Galli and Colamussi Reports, he determined that the Thatched Cottage was unsafe and unfit for human occupancy and or "structurally unsafe." *Id.* at 58-60. Cline testified that he specifically relied on section 107 of the New York State Property Maintenance Code as the statutory basis to placard the property. *Id.* at 55; Ex. 58. Cline testified that prior to November 18, 2014, he was not familiar with section 107 of the New York State Property Maintenance Code. Cline, Tr. 53, Jan. 13, 2020. Neither Cline, nor McNally nor Vacchio, consulted the Town Code during their November 18, 2014 discussion. *Id.* at 74-75. Cline testified that he did not know if the decision to placard complied with the Town Code. *Id.* at 77. Rather, Cline relied on McNally and Vacchio's years of experience and it made sense to him that if "[s]omething's unsafe, [y]ou hang a placard and have a conversation." *Id.* at 76-77.[7] At no time prior to deciding to placard, or

---

[7]    According to Cline, his strategy of opening a "conversation" worked. During his testimony, he reiterated that the placard was "the beginning of a conversation," Cline, Tr. 56, Jan. 13, 2020, "and it worked, because within three hours, the Trustee called the town. And it was effective. And we were very clear from day one that you had to address these reports to lift the placard." *Id.* at 170-71; *see also* Cline, Tr. 89-90, Jan. 14, 2020 ("It was an empty building and we thought it would start a dialog and a conversation to remedy a failing foundation or a wall that was falling. It would be—we'd get a plan submission in return within a week or two and that would be the end of it. We'd have—wrap it up and it would be a tidy fix.").

before the placard was placed, did Cline reach out to the Town Attorney to discuss proper procedures for the placarding. *Id.* at 70.

Although Cline claims to have relied on all of the Galli and Colamussi Reports in arriving at his decision, the record reflects that the Galli Reports were of particular importance in the decision to placard. *Id.* at 163-65; Ex. 45. Cline had heard of Galli but was not familiar with him or his engineering firm. Cline, Tr. 146-48, 156, Jan. 13, 2020. Sometime after receiving the Galli Reports and on or before November 18, 2014, Cline called Galli and asked him if he stood by the reports, but they did not discuss any details of the reports. *Id.* at 160-61. Cline did not make any effort to verify the conclusions in the Galli Reports. *Id.* at 156. Nor did Cline call any of the other engineers to discuss their reports. *Id.* at 164-65. Neither Cline, nor McNally nor Vacchio inspected the Thatched Cottage after reading the reports and before making the decision to placard. *Id.* at 156-57.

Cline testified that the decision to placard the Thatched Cottage was a singular event in that he had never before been presented with a situation where unsolicited third-party engineering reports were presented to the Town showing a structure was unsafe and unfit for human occupancy. *Id.* at 137. It was also singular in that he had never in his role as director of engineering for the Town made the decision himself to placard a property. *Id.* He testified he is not typically involved in placarding. *Id.* at 82.

Cline testified that he did not know at the time he made the decision to placard the Thatched Cottage that the building was under the control of the bankruptcy trustee. *Id.* at 86. In fact, Cline testified that he did not know about the bankruptcy or the pending sale to Raj, at all. *Id.* at 86-87, 115. At the time, Cline believed Colamussi to be the owner of the property (*Id.* at

87, 109) and he did not question why Colamussi, who he knew to be unstable as he had recently attempted suicide, would bring engineering reports to the Town "rais[ing] a red flag" showing the Thatched Cottage building was unsafe. *Id.* at 94-95, 124-25. Cline testified that he did not know, and did not question, who the Galli Reports were prepared for or for what reason. Cline, Tr. 150-151, 154, Jan. 13, 2020. Cline was, however, fully aware of the ongoing negotiations between the Town and Raj which would have addressed the structural concerns raised by the Colamussi Reports. *Id.* at 100-03. Cline was also aware of Raj's agreeability to making those repairs. Cline, Tr. 107, Jan. 14, 2020; Ex. 31U.

At the conclusion of the November 18, 2014 meeting Cline directed Vacchio to placard the Thatched Cottage building but left the specifics, including the form and wording of the placard, up to Vacchio. Cline, Tr. 176, Jan. 13, 2020. Cline did not tell Vacchio it was urgent but according to Cline he did expect it would be done the same day. *Id.* at Tr. 176-77. Cline called Del Col on November 18, 2014, to let her know that the decision to placard had been made even though it was not his normal procedure to advise Del Col of such decisions. *Id.* at 108. Cline also testified that on November 18 or 19, 2014, he called Breslin and advised him about the placarding. *Id.* at 117.

It was not until Thursday, November 20, 2014 that Vacchio placarded the Thatched Cottage. *Id.* at 175, 180-81. The 2-day delay appears to have been caused by another more urgent matter that Vacchio was attending to in the interim. *Id.* at 179-80. The placard does not reference section 107 of the NYS Property Maintenance Code. Ex. 40. It includes a telephone number for the Town of Huntington, states that the property is "unfit for human habitation pursuant to the Code of the Town of Huntington" and advises that occupancy of the building is unlawful and subject to $15,000 fine and/or six months imprisonment. *Id.* It does not assert a section of the

Town Code, or any other reason for placarding. *Id.* Vacchio testified that he did not "select" the form of placard, but rather "[i]t was all [he] had in [his] office." Vacchio, Tr. 58, Jan. 16, 2020. At no time prior to placarding did the Town give verbal or written notice to the Debtors, Chapter 11 Trustee or BFCU that the building was unfit for occupancy or request that repairs be made.

The decision to placard the building immediately changed the negotiations between Raj and the Town with respect to the licensing agreement to use the encroachments. Prior to November 18, 2014, an email exchange between Glascock and Breslin indicates that there were no substantial issues regarding the proposed licensing agreement. Ex. U. At 1:38pm on November 18, 2014, Glascock emailed Breslin's office regarding the licensing agreement, cc'ing Cline, Walsh, and Del Col, stating that "given the recently learned information on the condition of the building all structural deficiencies must be addressed before" the licensing agreement could be reached. Ex. 26; Ex. CC. At 1:47pm, Breslin replied that he had already spoken with Cline about the "deficiencies" and Raj had an engineer look at the Thatched Cottage and was "prepared to make whatever repairs are needed to satisfy the [T]own." Ex. 30. Glascock then consulted with Del Col, Cline and Walsh in an email exchange about adding the structural repairs as a condition to the license agreement. Ex. 31U. Del Col responded that she would have no problem adding that condition to the license agreement. *Id.* Glascock then emails Breslin that language regarding the repairs would be added as a condition to the licensing agreement. Ex. DD. Consistent with this exchange, Exhibit B to the proposed license agreement ("Items To Be Completed Prior to the Commencement Date") states: "The Catering Facility must be put into a structurally sound, safe and usable condition and state of repair as determined by the [Town of Huntington] in its sole determination." Ex. 32.[8]

---

[8]      For reasons still unexplained, Walsh forwarded Glascock's email, stating that he would add the structural repairs as a condition to the license agreement, to Del Col and asked "what does [Colamussi]

Shortly after the placarding, Raj refused to close on the purchase of the Thatched Cottage. Raj filed a motion to vacate the Court's October 16, 2014 order approving the sale, rescind the sale contract, and compel the Trustee to return his deposit in the amount of $465,000 plus buyer's premium of $186,000, for a total of $651,000. Motion, dated Dec. 12, 2014, Case No. 14-70001, ECF No. 273. In his motion, Raj argued that the property was marketed as a "waterfront" catering facility and he refused to close because the property was not in fact a waterfront facility as a result of the encroachment onto Town property. *Id.* Also, according to Raj, he "was unaware of the total uselessness of the building" prior to the placarding. *Id.* at ¶ 14. This Court denied Raj's motion to rescind the sale and determined that the Trustee was entitled to retain the deposit subject to BFCU's rights. Order, dated Jan. 15, 2015, Case No. 14-70001, ECF No. 291. Raj appealed, and this Court's ruling was affirmed by the District Court. Decision and Order, dated Aug. 24, 2015, Case No. 14-70001, ECF No. 389. Pursuant to a stipulation approved by this Court between the Trustee and BFCU, the Trustee retained $25,000 of the Raj deposit for the payment of estate expenses, and the remaining $626,000 was turned over to BFCU to pay down the secured debt. Stipulation and Order, dated Mar. 24, 2015, Case No. 14-70001, ECF No. 337.

On December 4, 2014, representatives of, and counsel for, both the Town and BFCU met to discuss the placard. According to Cline, at that meeting the Town made it clear to BFCU what had to be done to remove the placard: "[r]eview and address the defects noted in the report and submit a building permit plan . . . with corrective action or a report that countered the five reports

---

want?" Ex. 31U. Walsh testified that she could not remember this email or what specifically she meant by it. Walsh, Tr. 150-52, July 21, 2021. Del Col responds, "said we should be doing something about Thatched Cottage" and that she instructed her secretary "to tell him we were taking care of it." Ex. 31U. Del Col testified that she does not recall this email to Walsh, and therefore could not testify to whom she was referring, or what "taking care of it" meant**.** Del Col, Tr. 171-74, July 20, 2021.

in our possession." Cline, Tr. 146, Jan. 14, 2020. According to Jones (BFCU), the Town never told BFCU how to remove the placard. Jones, Tr. 71, Feb. 9, 2022. On this point they disagree.

As a result of Raj's default, BSG, as back up bidder was required to take title to the Thatched Cottage and did so on January 2, 2015.[9] On January 6, 2015, counsel for BFCU emailed Town Attorney, Cindy Mangano, and Glascock requesting permission to access the property to inspect the premises, change the locks and winterize. Ex. GGG. By email dated January 7, 2015, the requested access was granted. *Id.* There was no discussion in these emails about what steps needed to be taken to remove the placard. *Id.* On or about February 12, 2015, the Plaintiffs served a Notice of Claim on the Town asserting damages resulting from the placarding and the canceled Raj contract. Ex. 47.

In the fall of 2015, the Plaintiffs were in contract to sell the Thatched Cottage to an entity called the Matrix Group ("Matrix") for $4.1 million. Ex. JJ. However, that sale did not go through as a result of the death of the buyer's principal. Joint Pretrial Mem. at 60, ¶116; Exs. RR, SS; Jones, Tr. 136, Nov. 9, 2021.

In March 2016, "the Town discovered that he [sic] placard had been removed without the Town's permission and that substantial construction and repair work was going on at the Thatched Cottage. On March 10, 2016, the Town posted another placard and issued a Stop Work Order." Defs.' Pretrial Mem. of Law, ECF No. 177, at 9, ¶ 51. On March 10, 2016, the Defendants' counsel emailed the Plaintiffs' counsel, stating that "until the structural defects are addressed by … a [p]rofessional [e]ngineer or [a]rchitect saying [the Thatched Cottage] is safe in

---

[9]      On June 24, 2015, this chapter 11 case was converted to chapter 7, and R. Kenneth Barnard was appointed chapter 7 trustee.

writing, or … [p]ermit plans submitted to [the Town] … [n]o one should be inside the building[.]" Ex. GGG.

The Plaintiffs commissioned an engineering report (the "Pacifico Report") that was submitted to the Town on April 15, 2016. Joint Pretrial Mem. at 49, ¶¶ 222, 225; Ex. 49; Ex. GGG. The Town removed the placard on April 19, 2016. Joint Pretrial Mem. at 49, ¶ 227.

On July 5, 2016, Plaintiffs entered into a contract to sell the Thatched Cottage Property to Crest Cottage LLC ("Crest"), and the Property was sold to Crest for $2,800,000 on September 29, 2016. Joint Pretrial Mem. at 49, ¶ 229; Ex. VV; Ex. C.

In May 2017, Plaintiffs commenced an action against Chicago Title Insurance Company in connection with their coverage under a lender's title policy for the Thatched Cottage Property. Joint Pretrial Mem. at 50, ¶ 233. BFCU received approximately $500,000 from a settlement of that action. Jones, Tr. 40-41, Feb. 10, 2022.

## PROCEDURAL HISTORY

In February 2016, the Plaintiffs commenced this action against the Town and individual employees of the Town in state court.[10] Notice of Removal, ECF No. 1, Ex. A. The Defendants removed the action to this Court on March 11, 2016, asserting that the instant action is "related to" the Debtors' bankruptcy proceeding pursuant to 28 U.S.C. § 1334. *Id.* An amended complaint

---

[10]    On February 16, 2016, the chapter 7 trustee filed an adversary proceeding in this Court against the Town, Cline, McNally, Vacchio and other employees of the Town. Complaint, Adv. Proc. No. 16-8025, ECF No. 1. The Trustee's complaint asserted the following causes of action: (1) a claim for damages under 11 U.S.C. § 362(k) arising from Defendants willful violation of the automatic stay when they placarded the Property in violation of the automatic stay; (2) tortious interference with contractual relations; (3) negligence; (4) 42 U.S.C. § 1983 claims for violation of Plaintiff's due process rights; and (5) attorney fees under 42 U.S.C. § 1988. *Id.* In 2018, the Town settled with the Trustee for $117,500. Stipulation, dated June 22, 2018, Adv. Proc. No. 16-8025, ECF No. 108; Order, dated August 6, 2018, Adv Proc No. 16-8025, ECF No. 110.

was filed on August 12, 2016, and by motion, dated October 19, 2016, the Defendants moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF Nos. 15, 26. That motion was denied by Order, dated December 12, 2016. ECF No. 34.

On January 23, 2017, the Defendants moved to withdraw the District Court's reference of this adversary proceeding to the Bankruptcy Court. ECF No. 41. The motion to withdraw the reference was denied by Memorandum & Order of the District Court, dated November 25, 2019. ECF No. 159; *Bethpage Federal Credit Union et al. v. Town of Huntington et al. (In re Joe's Friendly Service & Son, Inc.)*, 17-MC-0190(JS), 2019 WL 6307468 (E.D.N.Y. Nov. 25, 2019) (Seybert, J). In denying the motion to withdraw the reference the District Court declined to rule on the issue of whether this Court had subject matter jurisdiction over this adversary proceeding and held that the bankruptcy court should decide that issue in the first instance. *Id.* at * 8.

Defendants moved for summary judgment on July 31, 2017. ECF No. 66. That motion was denied by this Court by Decision and separate Order, both dated March 21, 2019. ECF Nos. 110, 111; *Bethpage Federal Credit Union v. Town of Huntington (In re Joe's Friendly Service & Son, Inc.)*, No. 14-70001-reg, Adv. Proc. No. 16-8035, 2019 WL 1313519 (Bankr. E.D.N.Y. Mar. 21, 2019). The Individual Defendants appealed denial of summary judgment solely on the issue of qualified immunity. ECF No. 113. This Court's Decision was affirmed by Memorandum & Order of the District Court, dated November 25, 2019. ECF No. 160; *Bethpage Federal Credit Union et al. v. Town of Huntington et al. (In re Joe's Friendly Service & Son, Inc.)*, 19-CV-2010(JS), 2019 WL 6310207, at *15 (E.D.N.Y. Nov. 25, 2019) (Seybert, J).

On December 17, 2019, Defendants filed a motion seeking a determination that this Court lacks subject matter jurisdiction to hear this adversary proceeding. ECF No. 164. This Court denied that motion on the first day of trial, January 13, 2020, and subsequently, on June

11, 2020, issued a written Decision and separate Order finding that this Court has subject matter jurisdiction to hear and determine the instant adversary proceeding. ECF Nos. 204, 205; *Bethpage Federal Credit Union v. Town of Huntington. (In re Joe's Friendly Service & Son, Inc.)*, No. 14-70001-reg, Adv. Proc. No. 16-8035, 2020 WL 3120288, at *15 (Bankr. E.D.N.Y. June 11, 2020). Defendants appealed, and moved for leave to appeal the interlocutory order, on December 25, 2020. ECF Nos. 206, 207. On March 26, 2021, the District Court issued a Memorandum Decision & Order denying Defendants' motion for leave to appeal. ECF No. 223; *Bethpage Federal Credit Union v. Town of Huntington (In re Joe's Friendly Service & Son, Inc.)*, 628 B.R. 181 (E.D.N.Y. 2021) (Brown, J.).

Trial commenced on January 13, 2020, and continued for 18 non-consecutive days until April 25, 2022.[11] The Court heard testimony from the following witnesses: Defendant, Joseph F. Cline, Director of Engineering for the Town of Huntington in 2014; Defendant Terence McNally, Fire Marshall for the Town of Huntington in 2014; Defendant Richard Vacchio, Senior Building Inspector for the Town of Huntington in 2014; Thomas Glascock, Assistant Town Attorney for the Town of Huntington in 2014; Patricia Del Col, Deputy Town Supervisor for the Town of Huntington in 2014; Elizabeth ("Betty") Walsh, Special Assistant to the Town Supervisor in 2014; John J. Breslin, Jr. Esq.; Richard Koller, COO of Tauscher Cronacher Professional Engineers; Richard Galli, Galli Engineering, P.C.; Lawrence Jones, Vice President of Commercial Lending for Bethpage Federal Credit Union in 2014; Ronald James, Commercial Workout Officer for Bethpage Federal Credit Union in 2014. Over 150 exhibits were admitted and examined.

---

[11]    The trial of this matter was significantly delayed due to the COVID-19 pandemic.

At the conclusion of the proceedings on April 25, 2022, it was determined that the issue of liability would be decided by the Court prior to addressing damages, if any.

## DISCUSSION

### I.    Huntington Town Code in Effect in 2014

The Plaintiffs' constitutional due process arguments rest largely on allegations that the Town and the Individual Defendants failed to follow proper procedures in placarding the Thatched Cottage, and even if they had followed proper procedures, those procedures were insufficient to satisfy due process requirements. As such, the Court will review the relevant statutes in effect at the time of the placarding.

The Town Code of Huntington in effect in 2014 provided that in certain circumstances "any structure … may be condemned if, in the opinion of the code officer, it is unfit for human habitation or occupancy, and may be placarded." HUNTINGTON, N.Y., CODE, Ch. 124 (the "Town Code"), § 124-55 (2011); Exs. 60-67. The Town Code lists a number of conditions that would warrant such a placard, including, if the structure is unlawful, the structure creates a hazard to the health and safety of the occupants because of lack of maintenance, poor ventilation, damage or decay. *Id*. § 124-55(A)-(F). A "code officer" may also placard a structure if there is "any other condition which, in the opinion of the code officer, is dangerous or jeopardizes the health, welfare and safety of the general public or occupants." *Id.* § 124-55(G).

In making a determination that a structure is unfit for human habitation or occupancy, the "code officer," "or any consultant retained by the town may inspect" the premises that the code officers believes "in his or her judgment, is or may become dangerous or unsafe for human habitation, or threaten the health, safety or welfare of the occupants or general public, or is unlawful." *Id.* § 124-56. The Town Code further requires that "written notice shall be served by

28

the code officer upon the property owner . . . or any person having a vested or contingent interest in the property as shown on the current assessment roll of the Town . . . directing the removal, remediation or abatement of the unsafe . . . condition." *Id.* § 124-57(A). The Town Code requires the notice to contain a description of the property, a description of the unsafe condition, a description of the remedial action necessary for compliance, and a statement that, in the event of failure to bring the property in compliance with the Town Code, a fact-finding hearing will be held, among other things. Town Code § 124-57(B). The Town Code states "the notice shall be served either personally in accordance with the CPLR or by registered or certified mail . . . addressed to the property owner . . . or person having a vested or contingent interest in the property . . . ." *Id.* § 124-57(C).

The Town Code states that "an administrative hearing may be held by the Huntington Town Board or a duly appointed Administrative Hearing Officer, at the option of the Town." *Id.* § 124-59. If the hearing is before the Town Board, the Town Board "may consider the report and accept or reject, in whole or in part, the findings and recommendations of the code officer[.]" *Id*. § 124-59(A). Further, if the Town Board concludes that the structure is dangerous or unfit for human habitation, the "Town Board may condemn the structure . . . until the hazardous or unsafe condition is rectified as directed, and upon the failure, neglect or refusal of such person(s) to comply, the Board may authorize the code officer to re-placard[.]" *Id.*

If the hearing is conducted by an Administrative Hearing Officer, rather than the Town Board, "the Hearing Officer may consider the evidence and submit his or her findings and recommendations to the Code Officer for ultimate determination." *Id.* § 124-59(B). Then, "the Director shall consider the written objections and the Hearing Officer's report, and may adopt or reject, in whole or in part any portion thereof[.]" *Id.* "Upon a finding that the building . . . is or

may become dangerous or unsafe for human habitation or occupancy . . . the Code Officer may condemn the structure and direct the owner . . . or any person having a vested or contingent interest in the property to vacate . . . until the hazardous or unsafe condition is rectified as directed, and upon the failure . . . to comply, the Code Officer may authorize the building . . . re-placarded . . . ." *Id.* In such a circumstance, the "Code Officer's determination shall be final, and shall be filed in the Office of the Huntington Town Clerk and mailed to the person(s) to whom the original notice was served[.]" *Id.*

The Town Code prescribes special rules regarding unsafe structures if an emergency condition exists. The Town Code states that an emergency exists "in the judgment of the code officer . . . when there is imminent danger of failure or collapse . . . or when there is actual or potential danger to the occupants of or to those in the proximity of any structure . . . because of the existence of explosive fumes or vapors, or the presence of toxic fumes, gases or materials . . . or other imminent danger . . . ." Town Code § 124-61 (2011). In such an emergency situation the code officer "may issue a verbal or written order . . . to remedy the dangerous . . . condition … within forty-eight (48) hours of service of the notice . . . ." *Id.* If the condition constituting an emergency is not remedied, "the officer shall report his findings and recommendations to the Town Supervisor who, upon such findings, may execute a declaration of emergency authorizing town personnel to placard the property . . . ." *Id.*

In 2014, the Town Code had the similar rules for dilapidated or damaged buildings as it did for buildings that are unsafe for human habitation. *See* Town Code, Ch. 191 (2011). A building is dilapidated or damaged, if the code officer "upon inspection" finds circumstances such as a leaning or bulging wall, damage to the overall structure, improperly distributed loads, and more. *Id.* § 191-04 (2010). In 2017, § 191-06 of the Town Code ("Notice to remedy the

unsafe, unsanitary or hazardous condition") was amended and now specifically requires notice of violations to be given to the "occupant(s), and any mortgagees and/or lienholders shown on a title report . . . ." Ex. 66.

The Defendants claim that even though the placard specifically referenced the Town Code, they were not in fact relying on the Town Code when they decided to placard the Thatched Cottage. Cline, Tr. 75, Jan. 13, 2020. Rather, they claim to have placed the placard pursuant to section 107 of the New York State Property Maintenance Code. *Id.* at 55, 60; Ex. 58. The Court has already found that the Defendants' reliance on the New York State Property Maintenance Code was misplaced and held that the Town Code was the proper controlling authority for the placarding. *See In re Joe's Friendly Serv. & Son, Inc.*, 2019 WL 1313519, at * 7-8, *aff'd in part, appeal dismissed in part*, 2019 WL 6310207. Therefore, the procedural and substantive due process claims will be analyzed in the context of the Town Code.

## II.     The Constitutional Claims

The Plaintiffs allege that the placarding violated their rights under the Fourteenth Amendment to the U.S. Constitution to due process and equal protection under the law. The constitutional claims in this case are brought under 42 U.S.C. § 1983. Am. Compl. ¶¶ 133-197 (fourth and fifth causes of action,); *see Assoko v. City of New York*, 539 F. Supp. 2d 728, 734 (S.D.N.Y. 2008) ("Section 1983 'is not itself a source of substantive rights' but 'merely provides a method for vindicating federal rights elsewhere conferred.'") (citation omitted). Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit

in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.[12] Plaintiffs further

allege, under 42 U.S.C. § 1985, that the Individual Defendants conspired to deprive them of

constitutionally protected rights. Am. Compl. ¶¶ 198 – 206 (sixth cause of action). Finally,

Plaintiffs are seeking attorney fees under 42 U.S.C. § 1988. Am. Compl. ¶¶ 207–210 (seventh

cause of action).

### A.  42 U.S.C. § 1983. Fourth and Fifth Causes of Action

To prevail on a § 1983 claim, the Plaintiffs must prove that the Defendants (1) deprived

them of a federally protected right, and (2) did so "under color of any statute, ordinance,

regulation, custom, or usage, of any State or Territory." *Adickes v. S.H. Kress & Co.*, 398 U.S.

144, 150 (1970). The "federally protected rights" here are the Fourteenth Amendment rights to

due process and equal protection. The Court will first examine whether there was a deprivation

of Fourteenth Amendment rights, and if there was, then examine whether it was done under

"color of law."

### 1.  Deprivation of Fourteenth Amendment Rights

The Fourteenth Amendment to the Constitution provides, in part: "No State shall make or

enforce any law which shall abridge the privileges or immunities of citizens of the United States;

nor shall any State deprive any person of life, liberty, or property, without due process of law;

or deny to any person within its jurisdiction the equal protection of the laws." U.S. Const.

amend. XIV, § 1. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010)

(citing, *e.g.*, *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 778, n.14 (1978)); *see also*

*Bellotti*, 435 U.S. at 780, n. 15 ("It has been settled for almost a century that corporations are

---

[12]    Municipal corporations, like municipal employees, are "persons" who may be liable under §
1983. *Monell v. Dep't of Social Services of New York*, 436 U.S. 658, 700-701 (1978).

persons within the meaning of the Fourteenth Amendment") (citations omitted). The second and third clauses quoted above embody the so-called "due process" and "equal protection" clauses.

### a. The Due Process Clause

The Due Process clause requires both procedural and substantive due process before any person is deprived of "life, liberty, or property." *See Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2246 (2022). The elements of each type of due process claim are different but both require a deprivation by the defendant. In this case the alleged deprivation is of property. The Court will examine the property interests and alleged deprivations and then examine the elements of the separate due process claims.

### i. Deprivation of a property right

BFCU had constitutionally protected rights as the holder of a mortgage on the Property at the time of the placarding. *See First Nat'l Acceptance Co. v. City of Utica*, 26 F. Supp. 3d 185, 196 (N.D.N.Y. 2014); *see also Mennonite Bd. Missions v. Adams*, 462 U.S. 791, 798 (1993). Upon sale, BSG had constitutionally protected rights as the owner of the Property. Plaintiffs allege the Defendants violated their rights by placarding the Property without prior notice, and also by failing to provide a mechanism to have the placard removed thereafter. In this Court's view all potential liability in this case flows from the initial placarding of the Property without prior notice. Damages that result from that initial placarding until the date the placard was removed will be determined at a later phase of these proceedings.

Lower courts "have concluded that an action that severely diminishes the value of mortgaged property entitles the mortgagee to notice and an opportunity to be heard." *First Nat'l Acceptance Co.,* 26 F. Supp. 3d at 196 (holding that demolition by defendant city "seriously undermined the value of the mortgage that [p]laintiff held on that property" and entitled plaintiff

to notice and an opportunity to be heard). The value of the property need only be severely diminished—not completely destroyed or extinguished—by the actions in question for a mortgagee's due process protections to be triggered. *In re Joe's Friendly Serv. & Son, Inc.*, 2019 WL 6310207, at \*11-12. A temporary deprivation, such as we have in this case, is nonetheless a deprivation subject to due process requirements. *See, e.g., Fuentes v. Shevin*, 407 U.S. 67, 84-85 (1972) (it is "well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment") (citations omitted). While it is true, that a "mere decline in property value" does not support a Fourteenth Amendment deprivation claim, the question here is whether "the Property was 'effectively condemned' for a period of time thereby 'severely diminish[ing]' the value of the mortgaged Property." *In re Joe's Friendly Service & Son, Inc.*, 2019 WL 6310207, at \*12 (citation omitted).

The Court finds that the placarding "severely diminished" the value of BFCU's interest in the Property. This case does not involve a "mere decline in property value." *See First Nat'l Acceptance Co.*, 26 F. Supp. 3d at 196 (N.D.N.Y. 2014); *see also In re Joe's Friendly Service & Son, Inc.*, 2019 WL 6310207, at \*12. The record reflects that from the moment the placard was placed on the Property until it was removed by the Town approximately 17 months later, access to the Property was restricted such that any entry into the building for any reason required express permission from the Town. The placarding thus constituted a deprivation of both BFCU's rights as a mortgagee, and BSG's rights as the owner of the Property commencing January 2, 2015. Once the placard was placed on the Property by the Town, it became illegal to occupy any part of it and violators were subject to a $15,000 fine and/or six months imprisonment. Cline testified that it was his understanding that the placing of the placard effectively condemned the Property. Cline, Tr. 107, Jan. 13, 2020. The consequences of the

actions by the Town are in many ways unknowable. What we do know is the action made it so that anyone, including people with legal rights to be at the Property, whether it be for days, weeks or 17 months as in this case would be subject to a fine and possible imprisonment for violating the stated terms of the placard. The placard was not a harmless notice by the Town, it was an act that required obedience under severe penalty and had a profound impact on the Property.

In this Court's view these facts support a finding that the placarding severely diminished the Property's value and thus constituted a deprivation for purposes of the due process analysis with respect to BFCU. The continued maintenance of the placard during the period of BSG's ownership of the Property, until the day the placard was lifted, deprived BSG of the unfettered right to use of the Property. The exact economic consequence of the Defendants' acts is an issue to be determined at the damages stage of this case. At this stage, the Court only finds that the Plaintiffs were deprived of their respective property interests. Whether that deprivation was done without due process of law falls into two categories under the Fourteenth Amendment – procedural due process and substantive due process.

### ii. Procedural Due Process

Procedural due process requires "the government to provide notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Lussenhop v. Clinton County*, 466 F.3d 259, 269 (2d Cir. 2006) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). The right to prior notice and a hearing is central to the Constitution's command of due process. "'The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from

arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property . . .'" *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53 (1993) (quoting *Fuentes*, 407 U.S. at 80-81).

The exact type of notice and hearing to which the Plaintiffs were entitled is another question. "'[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 334-35 (finding that due process did not require an evidentiary hearing prior to termination of disability benefits).

The risk of erroneous deprivation of property rights was significant here. Cline made the decision to placard the Property primarily based on the report of an engineer who was not well known to him. Cline did not question who the report was prepared for or for what purpose. If he thought the report was prepared for Colamussi, he did not question why Colamussi would want to raise awareness about alleged structural infirmities at the Thatched Cottage. Cline did not conduct his own inspection of the Property. He did not consult with the Town Attorney about the proper procedures to follow when placarding a building under these circumstances, or even about whether the Town Code or New York state law applied. When Cline decided to placard the Property without prior notice to anyone he created a high level of risk that parties, including BFCU, would be erroneously deprived of protected property rights without due process. As for the third factor in the *Mathews* analysis, it can hardly be said that it would impose a fiscal and

administrative burden on the Town to have required notice to be served prior to placing the placard in this case. As Cline testified, the fact scenario presented in this case was *sui generis*. Giving notice prior to placarding in this case would not have imposed an undue fiscal or administrative burden on the Town, especially when weighed against the property rights being affected.

Of course, there are certain situations in which pre-deprivation notice would be impractical, in which case the *Mathews* factors would weigh in favor of post-deprivation notice and hearing being sufficient. *See James Daniel Good Real Property*, 510 U.S. at 53 ("We tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in 'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'") (citations omitted).

Post-deprivation notice and hearing might satisfy procedural due process requirements in two situations in which pre-deprivation notice would be impractical. *See Ferreira v. Town of East Hampton*, 56 F. Supp. 3d 211, 225 (E.D.N.Y. 2014). A post-deprivation remedy, such as an Article 78 proceeding, satisfies due process in cases where the deprivation occurs: in emergency situations, or when the deprivation results from "random, unauthorized state conduct" which could not have been predicted. *Id; Libbey v. Vill. of Atlantic Beach*, 982 F. Supp. 2d 185, 208 (E.D.N.Y 2013); *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003). Neither of those situations is the case here.

The Defendants' position is that the Galli and Colamussi Reports presented them with an "emergency situation" which presented a risk of injury to the public and which needed to be remedied immediately without notice. But this contention is belied by the facts. At the time of the placarding, the Property had already been closed to the public for over a month, and the

Property was surrounded by a fence. Vacchio, Tr. 45, Jan. 16, 2020. The Town allowed the Thatched Cottage to operate a catering facility for years following the flooding and subsequent settling caused by Hurricane Sandy. The Town's decision to issue an occupancy and assembly permit for the Property on August 18, 2014 discredits the Defendants' position that the Property's structural condition constituted an emergency situation making pre-deprivation notice and hearing impractical. Finally, and perhaps most notably, Vacchio did not placard the Property until November 20th, two days after Cline directed him to placard the property. Vacchio, Tr. 77-80, Jan. 16, 2020. As Vacchio testified, the Thatched Cottage was not in imminent danger of collapsing. Vacchio, Tr. 61, Jan. 16, 2020. If this was truly an emergency situation, the Defendants would have placarded the Property immediately. In addition, the two-day delay from deciding that an emergency situation existed and the placing of the placard would have been ample time to give the pre-deprivation notice required by due process. The Court finds that this was not an emergency situation.

Pre-deprivation notice may also be excused if the defendant's actions were "random and unauthorized." However, in this Circuit the "'random and unauthorized' exception to the requirement of a pre-deprivation hearing does not apply where the government actor in question is a high-ranking official with 'final authority over significant matters.'" *DiBlasio,* 344 F.3d at 302 (quoting *Burtnieks v. City of New York*, 716 F.2d 982, 988 (2d Cir. 1983)). Despite Cline's testimony to the contrary, the Town Code explicitly granted Cline, as the Town's "code officer," or his "designee," the authority to placard unsafe properties believed to be unfit for human habitation or occupancy. *Compare* Cline, Tr. 81-82, Jan. 13, 2020 *with* Town Code §§ 124-55 (2011), 124-03 (2011). As Director of Engineering Services for the Town of Huntington in 2014, Cline testified that he had final decision-making authority regarding the decision to placard the

Thatched Cottage. Cline, Tr. 71, Jan. 13, 2020. Cline also testified that the Town had a practice of placarding a building without prior notice and that the placarding was typically "the beginning of a conversation." *Id.* at 56. Similarly, Vacchio testified at deposition that the Town's practice often was to placard and then provide notice to the property owner describing why the property was placarded. Ex. 75, Vacchio, Dep., Tr 24, 26, June 1, 2017 ("The procedure has been sketchy at best, but we post, write a report. It gets mailed by the director or deputy. . . . You can't find the property owners at times. If it's very dangerous, you post that placard to get the attention of whoever is going to go to that property to contact us, to let us do what we have to do or instruct them what to do."). Thus, the conduct here was not random and unauthorized; rather it appears to have been a common practice and, as such, pre-deprivation notice is  notexcused.

For these reasons, the Court finds the Plaintiffs' procedural due process rights were violated.

### iii.  Substantive Due Process

The Amended Complaint alleges that Plaintiffs were deprived of their substantive due process rights "due to the utter failure of the Defendants to abide by laws and regulations either prior to or after" the placarding of the Thatched Cottage, and because the placarding was "wholly arbitrary and capricious." Am. Compl. ¶¶175-177.

In order to establish a violation of a right to substantive due process in this context, a plaintiff must demonstrate that a valid property interest was deprived by government action and "that the government action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Ahmed v. Town of Oyster Bay*, 7 F. Supp. 3d 245, 256 (E.D.N.Y. 2014) (quotations omitted) (citing *Pena v. Deprisco*, 432 F.3d 98, 112 (2d Cir. 2005)). In the Second Circuit, in order to meet this standard, "a plaintiff must show that the government

decision it challenges was arbitrary or irrational or motivated by bad faith." *Id.* (quotations omitted) (citing *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989)). The government action must be so "outrageously arbitrary as to constitute a gross abuse of government authority." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).

The Defendants' position is that the posting of the placard was neither arbitrary nor irrational as it was based on the Galli and Colamussi Reports, and that it was not in bad faith as the Defendants never intended to deprive the Plaintiffs of their rights by placarding the Thatched Cottage. Defs.' Pretrial Mem. of Law at 27. As for the maintenance of the placard thereafter, the Defendants argue that their decision to grant Plaintiffs access to the Property when requested negates any inference of bad faith or abuse of power. *Id.* at 27.

Courts hold that a government's failure to follow its own laws may represent a substantive due process violation in this context, so as to mark sufficiently arbitrary conduct for purpose of the aforementioned standard in the Second Circuit, only where the government's actors have engaged in "the most egregious official conduct," *See Sonne v. Bd. of Trs. of Vill. of Suffern*, 887 N.Y.S.2d 145, 152-53 (N.Y. App. Div. 2d Dep't 2009) (quotations omitted) (citing *Bower Assoc. v. Town of Pleasant Val.*, 814 N.E.2d 410, 416 (N.Y. 2004)), which can be shown by a "culpable state of mind." *See First Nat'l Acceptance Co.*, 26 F. Supp. 3d at 199 (quoting *Catanzaro v. Weiden*, 188 F.3d 56, 64 (2d Cir. 1999)). Absent such a showing, the government's failure to follow its own rules is merely "incorrect or ill-advised" and insufficient to form the foundation of a substantive due process claim related to the deprivation of a valid property interest. *See Id.* (citing *Cantanzaro*, 188 F.3d at 64).

In *First National Acceptance Company v. City of Utica*, the District Court for the Northern District of New York granted summary judgment for the City of Utica as to substantive

due process claims brought by a mortgagee whose collateral was demolished without notice and an opportunity to be heard following a city inspector's determination that the apartment building collateralizing the mortgagee's loan was unoccupied, unsecured, and contained combustibles. *First Nat'l Acceptance Co.*, 26 F. Supp. 3d at 199. As the plaintiff mortgagee in that case alleged, the City of Utica's demolition of the building was "arbitrary and lawless" because (i) the mortgagee was not contacted prior to the demolition in violation of New York's Multiple Dwelling Law, (ii) the City of Utica brought the action resulting in an order authorizing the demolition in the wrong court, and (iii) the City of Utica's inspector did not actually inspect the building and arbitrarily determined the building to be unsafe. *Id.* at 198. The inspector had no knowledge of who or what was inside the building, having conducted only a "drive-by" inspection and later taking photographs of the building from the street. *Id.* at 191-92. As the court held, the plaintiff mortgagee in the case failed to produce evidence indicating that the city defendant's "conduct was motivated by a desire to injure the [p]laintiff or for some other improper purpose." *Id.* at 199.

The government actor's state of mind was similarly dispositive to the substantive due process question in *Sonne v. Board of Trustees of the Village of Suffern*. In that case, an owner of a commercial property submitted applications to the Village of Suffern for certificates of use allowing the plaintiff to lease the third floor of the building, and the Village wrongly denied the application based on a misinterpretation of the Village Code which governed the application. *See Sonne v. Board of Trustee of Village of Suffern*, 887 N.Y.S.2d at 152-53. As the New York Appellate Division for the Second Department held in that case, the "apparent misinterpretation of Village code provisions did not constitute egregious official conduct," thus leaving the

plaintiff with insufficient evidence to support an alleged substantive due process violation. *Id.* at 153.

A plaintiff may also show sufficiently "arbitrary or irrational" government decision-making to succeed in a substantive due process claim as to a protected property interest by showing that the interest deprived was "tainted with fundamental procedural irregularity." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 789 (2d Cir. 2007) (quotations omitted). In *Cine SK8, Inc. v. Town of Henrietta*, the Second Circuit Court of Appeals held that substantive due process claims of a recreation center operator, whose special use permit was amended by the Henrietta Town Board to prohibit dances for teenagers following concerns that too many "city kids" were frequenting the recreation center, could proceed to trial. *Cine SK8, Inc.*, 507 F.3d at 785-90. As the court wrote, "[e]ven in the absence of the evidence of racial animus, the Board's actions were likely sufficiently arbitrary or irrational to preclude granting summary judgment to defendants." *Id.* at 789. Most significant for the court in reaching that conclusion was the fact that the Code of the Town of Henrietta did not provide for special use permits to be amended, but rather only for them to be revoked or suspended. *Id.* Additionally, the court found that the Town Board failed to follow its code provisions which guaranteed the plaintiff a right to cross-examine opposing witnesses at hearings required to be held prior to the suspension or revocation of a special use permit. *Id.* at 790. For those reasons, the court reversed the lower court's grant of summary judgment in favor of the Town of Henrietta on the substantive due process claim. *Id.*

The Court finds that the Defendants' conduct was egregious and "so outrageous[] that it may fairly be said to shock the contemporary conscience." *See Ahmed v. Town of Oyster Bay*, 7 F. Supp. 3d at 256. The Defendants' actions were tainted with procedural irregularities, taken with a culpable state of mind and for an improper purpose, and were not just incorrect or ill-

advised. The Defendants here used their power to effectuate a goal, which they argue was well-intentioned, *i.e.,* to protect the public and bring the Property into compliance. However, the strategy employed to effectuate that goal was entirely improper. This Court believes that the entire objective of the placarding was to force the prospective purchaser to remedy alleged deficiencies at the Thatched Cottage before it could be re-opened. While this may have been a noble goal, the Defendants intentionally trampled on the constitutionally protected rights of the Plaintiffs in the process and it is that which the Court finds outrageous and conscious-shocking. The testimony elicited at trial is that the placarding was intended to be the "beginning of a conversation." Cline, Tr. 56, Jan. 13, 2020. After placarding, Cline thought the Town would "get a plan submission in return within a week or two and that would be the end of it. We'd have—wrap it up and it would be a tidy fix." Cline, Tr. 89-90, Jan. 14, 2020. The Defendants' strategy here shows a culpable state of mind and entirely improper purpose to the placarding despite the seemingly proper objective. Add to all of this, the fact that absolutely no regard was given to the proper procedure to follow prior to placarding the Thatched Cottage and this Court finds that the Plaintiffs' substantive due process rights were violated.

### b. Equal Protection

The Plaintiffs allege that the Defendants' placarding of the Property and maintenance of the placard thereafter represented selective enforcement and denied them equal protection under the law. Am. Compl. ¶¶ 183-197; *see* U.S. Const. amend. XIV, § 1. The Amended Complaint alleges that the Defendants gave Colamussi preferential treatment through the years he operated the Thatched Cottage and took no action and conducted no investigation with respect to complaints about the Property prior to receiving the Galli and Colamussi Reports. Am. Compl. ¶¶ 184-185. The Amended Complaint also asserts that the Plaintiffs' respective property interests

in the Property were negatively impacted by the placarding and the maintenance of the placard. *Id.* ¶ 190. The Amended Complaint ascribes to the Defendants' actions the improper motive of assisting and benefitting Colamussi. *Id.* ¶¶ 186-89.

Where plaintiffs, as here, are not members of a constitutionally protected class, a defendant can be found to have violated a plaintiff's constitutional right to equal protection under the law via either of two theories, "selective enforcement" or "class of one." *Vaher v. Orangetown*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013); *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995). A selective enforcement claim requires a plaintiff to show that:

> (1) he, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, or to punish or inhibit the exercise of constitutional rights, or by malicious or bad faith intent to injure the plaintiff.

*Vaher*, 916 F. Supp. 2d at 433 (citing *Zahara*, 48 F.3d at 683 (quotations omitted)).

A class of one claim requires the plaintiff show that: "(1) he was 'intentionally treated differently from others similarly situated,' and (2) 'that there was no rational basis for the difference in treatment.'" *Vaher*, 916 F. Supp. 2d at 433 (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). The Defendants argue that they did not "act for an improper purpose or treat Plaintiffs differently than others who were similarly situated." Joint Pretrial  Mem. at 73.

The Court holds that the record does not support a finding that the Defendants treated Plaintiffs differently from others who were similarly situated, or even if they did so, that their actions were irrational or motivated by an intent to discriminate. The facts presented by this case are, to say the least, *sui generis*. As argued, in part, by the Defendants, never before had the Town been presented with multiple engineering reports asserting structural infirmities at a property at the same time that a prospective purchaser for that property was on the verge of

closing a sale and negotiating the terms of an agreement with the Town to allow them to reopen for business. In this way, the Plaintiffs were not situated similarly to Colamussi. There is no evidence to show that the Town had any knowledge of the Galli and Colamussi Reports prior to November 2014 during Colamussi's management of the Thatched Cottage. The Plaintiffs are correct that Colamussi was allowed to operate the Thatched Cottage during a time when the alleged structural infirmities existed at the Thatched Cottage. However, there is no evidence that Defendants knew about the structural condition of the building until they received the Galli and Colamussi Reports. There are only suggestions that they should have known because of the June 2013 inspection related to the assembly permit, and subsequent inspections related to the August 2013 fire damage. The situations were also not similar because in November 2014 when the Defendants placarded the Property there was an impending sale of the Property which, this Court believes, caused them to take actions they had not previously taken to remedy issues with the encroachment and bulkhead. There was no impending sale during the time Colamussi was allegedly treated preferentially by the Town and this also makes the situations different.

The record does not support a finding that the Defendants had an intent to discriminate against or to injure Plaintiffs. Rather, the record leads this Court to conclude that the Defendants' intent was to force the prospective purchaser to cure alleged infirmities at the Property that existed for years and which the Town was fully aware of for at least one year prior to the placarding. The Court believes that the Town's actions were motivated by the desire primarily to protect itself from liability, and also to protect the public, but not to favor Colamussi or discriminate against the Plaintiffs. Vacchio, Tr. 109, Jan. 16, 2020 (agreeing that Cline's "primary motivation in determining to placard the premises was the possibility of liability if they did nothing and somebody got hurt"); Cline, Tr. 109-11, Jan. 14, 2020 (stating that he made the

45

decision to placard, despite having recently assured Breslin that the Town would expedite any applications towards re-opening the Thatched Cottage, because "[w]e were still concerned that an innocent person could get hurt and the town—how would that look, if the town had these five reports and didn't warn anybody, didn't post the building."); Glascock, Tr. 79, Sept. 29, 2021 ("I would assume that if somebody was injured, involving the Mill Pond, the Town would be named a party in a lawsuit.").

Therefore, the Plaintiffs have failed to prove the elements of their equal protection claim as against any of the Defendants and judgment will enter in favor of each of the Defendants on the fifth cause of action.

### 2. Color of State Law

Now that the Court has found that the Defendants deprived the Plaintiffs of their rights to due process, we will now examine whether that was done under "color of state law." "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). For example, municipal employees in "positions of considerable authority" to direct the deprivation of protected liberty interests act under color of state law when they act to exercise their discretionary authority. *See Burtnieks*, 716 F.2d at 986 (citing, *e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 256 (1970)). Where an officer exceeds his authority, state action under the Fourteenth Amendment, and thus conduct under color of state law for § 1983 purposes, continues to exist. *See Lugar* v. Edmondson Oil Co., Inc., 457 U.S. 922, 929 ("'[misuse] of power, possessed by virtue of state law and made possible only

because the wrongdoer is clothed with the authority of state law, is action taken under color of state law . . . .'") (quoting *Classic*, 313 U.S. at 326).

Each of the Individual Defendants here had the authority under the Town Code to adjudge properties as "unfit for human habitation or occupancy" and have them placarded. *See* Town Code § 124-55 (2011). Cline, although he testified that he was not a "code enforcement official" or a "code officer," Cline, Tr. 76, 81, Jan. 13, 2020, was in fact a code officer as defined by the Town Code. *See* Town Code § 124-03 (2011) (defining "code officer" as "[t]he Director of Engineering Services, Director of Public Safety, or his or her designee"). Defendants Vacchio and McNally, as Senior Building Inspector and Chief Fire Marshal respectively, indisputably possessed the power to placard buildings for code violations. Cline, Tr. 81-83, Jan. 13, 2020; Vacchio, Tr. 58, Jan. 16, 2020; McNally, Tr. 159-60, Jan. 15, 2020. Although the Defendants were acting outside the scope of their authority when they failed to follow the Town Code procedures prior to the placarding, that does not change that they were "clothed with the authority of state law" when they did so due to the positions they held with the Town, as well as the placard itself which proclaimed to have been hung pursuant to the Huntington Town Code. *See Lugar*, 457 U.S. at 929; Ex 40.

The Court finds that the Defendants were acting under color of state law when they placarded the Thatched Cottage.

### 3. The Individual Defendants' Liability

The Individual Defendants argue that they are entitled to qualified immunity as to the § 1983 claims. Defs.' Pretrial Mem. of Law at 37. Summary judgment on qualified immunity was denied by this Court, and that denial was affirmed by the District Court. At this stage, the Court will decide the issue of qualified immunity on the merits.

47

### a. Qualified immunity

Where government officials are sued in their individual capacity the doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 531 (2d Cir. 1993); *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991). It does not protect government officials performing ministerial duties, *see Walz v. Town of Smithtown*, 46 F.3d 162, 169 (2d Cir. 1995) (finding no qualified immunity where defendant failed to issue street excavation permit as a means of extorting land from homeowners), nor does it protect government officials who are sued in their official capacity, *see Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985).

The Court finds that the Defendants actions here were discretionary and not ministerial. "In contrast with the thought processes accompanying 'ministerial' tasks, the judgments surrounding discretionary action almost inevitably are influenced by the decisionmaker's experiences, values, and emotions." *Harlow*, 457 U.S. at 816. As a professional engineer, Cline "felt" that he "had an ethical obligation" to have the property placarded. Cline, Tr. 108, Jan. 13, 2020. The act here was far from a robotic, ministerial task, but instead a decision made by Cline in accordance with the authority vested in him under the Town Code.

The Court must therefore decide whether the Individual Defendants' conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 817-18. "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3)

a reasonable defendant [would] have understood from the existing law that [his or her] conduct was unlawful." *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (internal quotation marks and citation omitted; first alteration in original). As found by Judge Seybert in her decision affirming the denial of summary judgment, "the 'clearly established' law here is a mortgagee's right to notice prior to state conduct that 'severely diminish[es]' the value of the mortgaged property." *Joe's Friendly*, 2019 WL 6310207, at *13. Judge Seybert found a mortgagee's rights to due process, under *Mennonite* and its progeny, were "clearly established" at the time of the events in this case. *Joe's Friendly*, 2019 WL 6310207, at *13. That the Defendants' actions "severely diminished" the value of the Plaintiffs' property has been previously addressed by this Court in this Decision. *See discussion, supra.*

Finally, in order to determine whether the Individual Defendants are entitled to qualified immunity, the Court must determine whether a reasonable person would have known of the Plaintiffs' clearly established rights to due process. *See Harlow*, 457 U.S. at 818-19. The Individual Defendants argue that their actions in placarding the Thatched Cottage were objectively reasonable based on the Galli and Colamussi Reports upon which they relied. Defs.' Pretrial Mem. of Law at 37. The Court disagrees. To the extent the Individual Defendants argument rests on the alleged emergency nature of the situation presented, this Court has already found that an emergency situation was not borne out by the facts of this case. *See discussion, supra*. This Court finds that there is no objectively reasonable basis upon which the Individual Defendants could effectively condemn the Thatched Cottage without notice. This conclusion is underscored by the facts surrounding a fire at the Thatched Cottage only one year prior to the events at issue in this case.

In August of 2013 there was a small accidental fire at the Thatched Cottage which caused damage to the ceiling joists in the basement underlying the floor of one of the ballrooms, as well as smoke and water damage throughout the building. McNally, Tr. 12-13, 23, Jan. 15, 2020. As a result of the fire, McNally testified that he gave Colamussi oral notice that he was going to placard the building. *Id.* at 21. He also issued a written notice of violation and a field report to Colamussi related to the fire damage prior to placing the placard. *Id.* at 22. McNally testified that he gave Colamussi verbal instructions as to what needed to be done to have the placard lifted. *Id.* at 24. When the repairs were done a day or two later, Colamussi called McNally at which point McNally and Vacchio inspected the area that was fire damaged and lifted the placard. *Id.* at 27-30. This sequence of events shows that McNally knew that notice should be given prior to placarding and underscores the objective unreasonableness of the decision made to placard the Thatched Cottage without notice in November 2014.

The Individual Defendants were employees of the Town entrusted with the power to impact the property rights of individuals and institutions within the Town of Huntington. It would not be objectively reasonable for them to be ignorant of the notice provisions of the Town Code, which provisions were intended to satisfy due process, or to just ignore them. *See Anderson*, 317 F.3d at 197 ("'The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct.'") (quoting *McCullough v. Wyandanch Union Free Sch. Dist.,* 187 F.3d 272, 278 (2d Cir.1999)).

The Court will not grant the Individual Defendants qualified immunity for their actions in this case.

### b. Causation

Causation is an element of any claim under § 1983 which must be "read against the background of tort liability." *Monroe v. Pape*, 365 U.S. 167, 187 (1961), *overruled, in part, on other grounds, Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978). "Causation is a standard element of tort liability, and includes two requirements: (1) the act must be the 'cause-in-fact' of the injury, *i.e.*, 'the injury would not have occurred absent the conduct'; and (2) the act must be the 'proximate cause,' . . . of the injury, *i.e.*, "the injury is of a type that a reasonable person would see as a likely result of his or her conduct.'" *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012) (citing *Ciomber v. Coop. Plus, Inc.,* 527 F.3d 635, 640 n. 1 (7th Cir. 2008)); *see Barnes v. Anderson*, 202 F.3d 150, 158-59 (2d Cir. 1999); *Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 287 (S.D.N.Y. 2019). In the Second Circuit, a § 1983 injury may be the reasonably foreseeable result of an individual defendant's conduct so long as there are not intervening acts by others that operate as superseding causes, also called independent causes, cutting off the proximate cause as to the conduct in question. *See Taylor v. Brentwood Union Free Sch. Dist.*, 143 F.3d 679, 688 (2d Cir. 1998) (discussing *Warner v. Orange Cnty. Dept. of Prob.*, 115 F.3d 1068, 1071 (2d Cir. 1997)).

This case does not present complicated facts involving intervening causes for the Plaintiffs' alleged harm. The placarding of the Thatched Cottage without following proper notice procedures was the direct cause of the deprivation of the Plaintiffs' due process rights. However, the Court must analyze each of the Individual Defendants separately to determine whether and how their actions caused the placarding.

First, Cline. It is uncontroverted that Cline made the decision to placard the Thatched Cottage. Clearly, it was Cline's action in deciding to placard the Thatched Cottage and

instructing Vacchio to placard the building without giving notice to Plaintiffs that caused the violation of Plaintiffs' due process rights. Next, McNally. The only allegation of the Amended Complaint that is specific to McNally alleges that "Defendant McNally . . . received and accepted the Galli Report from Colamussi, knowing Colamussi's true intent was to stop the impending sale of the [Thatched Cottage], and specifically set in motion the plan to conspire with Colamussi . . . by 'condemning' the [Thatched Cottage]." Am. Compl. ¶ 165. The remainder of the allegations against McNally group him with Cline and Vacchio and ascribe to all three of them the decision to placard the Thatched Cottage as a result of their participation in the November 18, 2014 meeting. However, the record reflects that while there was a discussion in which McNally participated, that is the entire extent of his involvement in this case. Again, the record is clear that the decision to placard was Cline's. As for the allegation that McNally accepted the Galli and Colamussi Reports as part of a conspiracy with Colamussi, that is not borne out by the facts of this case. *See discussion, infra*. The Court will not find that McNally's actions caused the deprivation of Plaintiffs' rights. Finally, Vacchio. It is undisputed that Vacchio placarded the Thatched Cottage. He was in agreement with Cline that the Thatched Cottage should be placarded. He chose the form, signed it and placed it at the Thatched Cottage. Therefore, the Court finds that Vacchio's actions caused the deprivation of the Plaintiffs' due process rights. *See Lippoldt v. Cole*, 468 F.3d 1204, 1220 (10th Cir. 2006) (finding defendant liable because his signature was on the permit denial letter, even though he was only "signing for" his superior and even where he was not the decision-maker).

The Court finds Cline and Vacchio are liable for any damages ultimately found by the Court under the fourth cause of action of the Amended Complaint for violation of Plaintiffs' due process rights.

### 4. The Town's Liability

Municipalities are not strictly liable under § 1983 for their employees' constitutional torts, but they are liable for their own actions, namely the adoption of policies or customs resulting in deprivations of rights. *Monell*, 436 U.S. at 694. In other words, a municipality is liable for its employees' constitutional torts where a plaintiff establishes (1) that the constitutional violation resulted from a "municipal policy or custom," and (2) the policy or custom caused the plaintiff's injury. *See Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44-45 (2d Cir. 1985); *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 412-15 (1997)..

### a. Municipal Policy or Custom

A municipal policy or custom for purposes of the first element of municipal liability under *Monell* may be proven by any one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by the government officials responsible for establishing municipal policies related to the particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials; or (4) a failure by policy makers to train or supervise subordinates.

*Harris v. City of New York*, 222 F. Supp. 3d 341, 352 (S.D.N.Y. 2016) (quotations omitted). The *Monell* standard has been satisfied in this case.

First, the Court finds that it was the Town's formal policy not to provide notice to a mortgagee prior to placarding a building based on the fact that notice to a mortgagee was not required by either § 124-57 or § 191-06 of the Town Code in 2014. This is a "written rule" indicating that the constitutional violations here did result from a policy or custom of the Town. *See*, *e.g.*, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986).

Second, the Court finds that Cline, as Director of Engineering Services for the Town of Huntington, was in a position such that he was responsible for establishing Town policy related to the placarding. Cline testified that he had the power to make decisions related to placarding and he in fact did so in this situation. Cline, Tr. 71, Jan. 13, 2020. He testified that he called his direct superior, Deputy Town Supervisor Pat Del Col to advise her of his decision, and she consented, although he did not seek her approval. As such Cline "possesse[d] final authority to establish municipal policy with respect to the action ordered," *see Pembaur*, 475 U.S. at 481, and his decision "constitute[d] the municipality's final decisions," *see Roe v. City of Waterbury*, 542 F.3d 31, 38 (2d Cir. 2008) (quoting *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003)); *see also Pembaur*, 475 U.S. at 483 ("Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority . . . ."). Cline was thus a policymaker with final authority, and his decision represented the Town's policy or custom.[13]

The third way to establish municipal policy or custom, *i.e.*, that the practice was "consistent and widespread," is less clearly established in this case. While Cline testified that the normal practice was to placard without prior notice as a way to start a "conversation," the record

---

[13]    "Final authority" in the context of establishing an official policy or custom refers to the authority to make the decision to placard. That is separate and apart from the legal authority to placard the property without notice and a hearing. *See Monell*, 436 U.S. at 712 n. 8 (Powell, J., concurring) ("To the extent that the complaints in those cases asserted claims against the individual defendants in their personal capacity, as well as official capacity, the court would have had authority to award the relief requested. There is no suggestion in the opinions, however, that the practices at issue were anything other than *official, duly authorized policies*.") (emphasis added). The policy on this occasion was official and authorized, but it was not *duly* authorized given it was in violation of the U.S. Constitution. As discussed, the legal authority to proceed with the placarding was conditioned on providing pre-deprivation notice and a hearing as required by the Fourteenth Amendment. This is not to say that municipalities have *respondeat superior* liability. Rather, liability for a municipality in this context is created by official policymakers with final authority—not by mere employees acting within the scope of employment.

reflects that McNally gave Colamussi oral notice prior to placarding the Thatched Cottage after the fire in August 2013. McNally, Tr. 21, Jan. 15, 2020.

Finally, the record reflects that the Town did not provide due process training to the Individual Defendants prior to 2017. Cline testified that while code enforcement officers were required to attend 24 hours of New York State training annually, there was no training program in place for him prior to 2014 with respect to condemning a building. Cline, Tr. 54-55, Jan. 14, 2020. McNally also testified that code enforcement officers were subject to 24 hours of New York State training but he did not know if that included due process training. McNally, Tr. 51-52, Jan. 15, 2020. The Town did not have a separate due process training program in place until 2017 when the Town Code due process provisions were amended.[14] McNally, Tr. 51, Jan. 15, 2020. Had the Individual Defendants undergone even the most basic training as to code enforcement procedures they would have known of the Town Code's requirement that notice be given prior to placarding even in an emergency situation. There is no indication in the record that the Individual Defendants received training in this area and it seems apparent that there was none.

For all these reasons, the Court finds that it was the policy or custom of the Town to placard properties without providing pre-deprivation notice and a hearing.

### b. Causation

Having established that the violation of Plaintiffs' due process rights resulted from a "municipal policy or custom," the last issue to determine the Town's liability is whether that policy or custom caused Plaintiffs' injury, *i.e.*, whether the Town's deliberate conduct "was the

---

[14]    As previously mentioned, in 2017, § 191-06 of the Town Code ("Notice to remedy the unsafe, unsanitary or hazardous condition.") was amended to specifically require notice of violations to be given to the "occupant(s), and any mortgagees and/or lienholders shown on a title report. . ." Ex. 66.

'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 404. "[T]he conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id*. at 405; *see Vives v. City of New York*, 524 F.3d 346, 357-58 (2d Cir. 2008) (discussing *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. 397) (finding a policy or custom of unconstitutional conduct is always sufficient to establish causation as to a particular situation in which municipal officers or employees so acted)).

However, when a policy or custom is established under the failure-to-train theory, there is not necessarily deliberate conduct by the municipality. *See Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 406-07. Thus, in the failure-to-train context, where the policy or custom is not itself to engage in conduct that is unconstitutional, but unconstitutional conduct ultimately arises from that policy, the question is whether the municipality was "deliberately indifferent" to that risk as its "known or obvious consequences." *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 406-07 (discussing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Therefore, to establish the requisite causation in the failure-to-train context a plaintiff must show either (1) that the municipality's failure to train "display[ed] a *deliberate indifference* to the constitutional rights of those within the jurisdiction," or (2) that the municipality "had notice of but repeatedly failed to make any meaningful investigation into charges of misconduct by lower-level employees." *Newton v. City of New York*, 566 F. Supp. 2d 256, 271-72 (S.D.N.Y. 2008) (emphasis added). To show "deliberate indifference," a plaintiff must prove (1) "that a policy-maker knows to a moral certainty that her employees will confront a given situation[;]" (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make

less difficult or that there is a history of employees mishandling the situation[;]" and (3) "that the wrong choice by the [municipal] employee will frequently cause the deprivation of a citizen's constitutional rights." *Green v. City of New York*, 465 F.3d 65, 80-81 (2d Cir. 2006) (quotations omitted) (citing *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)).

The Court already found that a municipal policy or custom was established by both a formal policy of the Town not to require notice to mortgagees prior to placarding, and also that the actions taken by Cline in his position as Director of Engineering for the Town of Huntington established a municipal policy in connection with the placarding. This is sufficient to establish causation under the caselaw cited above. Therefore it is not necessary for this Court to decide whether the facts of this case support a finding of causation under the more stringent "failure to train" theory of municipal liability.

The Court finds that the Town's policy or custom of not providing pre-deprivation notice and an opportunity to be heard caused the constitutional violations here and the Town is liable for any damages ultimately found by the Court under the fourth cause of action of the Amended Complaint for violation of Plaintiffs' due process rights.

## B. Conspiracy. 42 U.S.C. § 1983 and/or 1985. Sixth Cause of Action

The Amended Complaint alleges that "[u]pon information and belief, Defendants Cline, Vacchio and/or McNally conspired and agreed to assist and/or appease Colamussi by impeding, hindering and/or preventing the sale of the Subject Property" and the placarding and subsequent maintenance of the placard constituted acts "by Defendants Cline, Vacchio and/or McNally in furtherance of their conspiracy to deprive Plaintiff(s) of its/their constitutional rights." Am. Compl. ¶¶ 198-206. The Court has already found a deprivation of due process rights in the

posting of the placard, but cannot find that there was a conspiracy among the Individual

Defendants that is actionable under the law.

Plaintiffs bring these claims under 42 U.S.C. §§ 1983 "and/or" 1985(3).[15]

> "In the context of a § 1983 claim, a civil conspiracy is [1] a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, [2] where those persons agree to inflict an injury upon another and [3] where there is an overt act resulting in damages."

*Carson v. Lewis*, 35 F. Supp. 2d 250, 271 (E.D.N.Y. 1999) (quoting *Covington v. City of New York*, No. 94 Civ. 4234(SAS), 1998 WL 226183, at *4 (S.D.N.Y. May 4, 1998)).

"'The scope of § 1985(3) is narrower than that of § 1983.'" *Id.* (quoting *Blankman v. Cty*

*of Nassau*, 819 F. Supp. 198, 205 (E.D.N.Y. 1993), *aff'd Blankman v. Cnty. of Nassau*, 14 F.3d

592 (2d Cir. 1993)).

> In order to state a conspiracy claim under 42 U.S.C. § 1985(3), a plaintiff must show: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or equal privileges and immunities under the law; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Cine SK8*, 507 F.3d at 791 (citing *Britt v. Garcia*, 457 F.3d 264, 270 n. 4 (2d Cir. 2006)).

---

[15]    42 U.S.C. § 1985(3) provides: "(3) Depriving persons of rights or privileges. If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

A claim under § 1985(3) requires a showing of discriminatory animus. *Id.* (citing *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999)).

The Plaintiffs have not met their burden of proving a conspiracy as alleged in the Amended Complaint. First, although the record does reflect that the Individual Defendants met and agreed that the Thatched Cottage should be placarded, it does not reflect that they were motivated by a desire to assist or appease Colamussi as is alleged in the Amended Complaint. As previously stated in this Decision, the Court believes their actions were motivated by a desire to ensure the remediation of certain alleged deficiencies before any new owner of the Property could operate a business at that location. This finding defeats the § 1983 conspiracy claim, as well as any claim of "discriminatory animus" under § 1985(3).

Second, Plaintiffs' claims are barred by the common law intracorporate conspiracy doctrine which provides that "'officers, agents, and employees of a single corporate entity are legally incapable of conspiring together.'" *Murphy v. City of Stamford*, 634 Fed. Appx. 804, 805 (2d Cir. 2015) (quoting *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008), and applying the doctrine to government as well as corporate employees). Regardless of whether the principal entity is corporate or governmental in nature, agents within the same organization cannot be found to have conspired as to acts within the scope of their employment. *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) (citing *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66 (2d Cir. 1976)). There is no dispute here that the Individual Defendants were acting within the scope of their employment.

Even if an act by municipal employees is within the scope of employment, it may be excepted from application of the intracorporate conspiracy doctrine's bar where the act is "motivated by an independent personal stake." *Little v. City of New York*, 487 F. Supp. 2d 426,

59

442 (S.D.N.Y. 2007) (quoting *Salgado v. City of New York*, No. 00 Civ. 3667(RWS), 2001 WL 290051, at *8-9 (S.D.N.Y. Mar. 26, 2001)). The "personal stake exception" has been found to apply in cases where, for example, police officers were alleged to have "covered up the use of excessive force," "engaged in race-based false arrests to improve their chances of promotions and benefits," and "assaulted a prisoner in retaliation for his participation in a federal lawsuit." *Ali v. Connick*, 136 F. Supp. 3d 270, 283 (E.D.N.Y. 2015) (citing *Hill v. City of New York*, No. 03-CV-1283(ARR), 2005 WL 3591719, at * 6 (E.D.N.Y. Dec. 30, 2005); *Yeadon v. N.Y.C. Transit Auth.*, 719 F. Supp. 204, 212 (S.D.N.Y. 1989); *Medina v. Hunt*, No. 05-CV-1460(DNH), 2008 WL 4426748, at *8 (N.D.N.Y. Sept. 25, 2008). There has been no allegation that the Individual Defendants had a "personal stake" in this matter such that the intracorporate conspiracy doctrine should not apply.

Therefore, the Plaintiffs have failed to prove the elements of the conspiracy claim under 42 U.S.C. § 1983 or 1985 and judgment will enter in favor of the Defendants on the sixth cause of action.

### C. Attorney Fees. 42 U.S.C. § 1988. Seventh Cause of Action

The Court may award reasonable attorney fees to parties prevailing on successful § 1983 claims. 42 U.S.C. § 1988. Whether to award the fees to a prevailing plaintiff, and at what amount, is a matter of the Court's discretion. *Id.* "'[T]he most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained'." *Farrar v. Hobby*, 506 U.S. 103, 114 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)). Thus, a court may be found to have abused its discretion in an action where "a plaintiff has achieved only partial or limited success" and the court awards fees "reasonably expended on the litigation as a whole times a

reasonable hourly rate." *Id.* at 114-15 (quoting *Hensley*, 461 U.S. at 436). This is especially the case in an action where plaintiffs are awarded only nominal damages. *Id.*

The Court will determine liability, if any, under 42 U.S.C. § 1988 after the conclusion of the damages phase of this litigation.

## III. The State Law Claims

The plaintiffs assert three claims against the Defendants under New York common law: tortious interference with contract, tortious interference with prospective economic advantage, and negligence. All of the claims are brought against each of the Individual Defendants as well as the Town.

### A. Tortious Interference with Contract – First Cause of Action

The first cause of action of the Amended Complaint is for tortious interference with contract. The Amended Complaint alleges the following: the contract executed by the Trustee and Raj was a valid contract for the purchase and sale of the Property; BFCU, as mortgagee, was the primary intended beneficiary of that contract as most if not all of the proceeds from the sale to Raj would have inured to the benefit of BFCU; Defendants were aware of the existence of the Raj contract; Defendants knew that the placarding would cause Raj to breach the contract, they intended to cause that breach, they used wrongful means to induce Raj's breach, and but for the Defendants' actions Raj would not have breached the contract; and Plaintiffs were damaged as a result of Defendants' actions which interfered with and/or destroyed Plaintiffs' use of the Property, and substantially hindered and diminished Plaintiffs' ability to market and sell the Property at fair market value. Am. Compl. ¶¶ 84-100.

Defendants respond that Plaintiffs have no independent right to assert a claim for breach of the contract between the Trustee and Raj, and even if they did there is no evidence that the

Defendants intended to procure Raj's breach or that the Plaintiffs sustained any damages as a result of Defendants' conduct. Defs.' Pretrial Mem. of Law at 14-16.

> Under New York law, the elements of tortious interference with contract are: (1) "the existence of a valid contract between a plaintiff and a third party"; (2) the "defendant's knowledge of the contract"; (3) the "defendant's intentional procurement of a third party's breach of the contract without justification"; (4) "actual breach of the contract"; and (5) "damages resulting therefrom."

*Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)).

This Court has already held that the purchase agreement between the Trustee and Raj was valid, it was breached, and that the Plaintiffs were intended third party beneficiaries of the contract with standing to assert the claim for tortious interference with contract. *See In re Joe's Friendly Service & Son, Inc.*, 2019 WL 1313519, at *20-21. That leaves three questions remaining for resolution: whether the Defendants knew about the sale contract, whether the Defendants intended to procure Raj's breach of the contract without justification, and whether damages resulted therefrom.

First, the record is unclear as to whether the Defendants believed Raj to be a prospective purchaser or the "new owner" of the Thatched Cottage. From the first week in October 2014 through the date of the placarding, Raj and his representatives were actively discussing with Town employees, including Cline, how to reopen the Thatched Cottage. Cline was involved in those discussions, having been forwarded Hoffman's October 27th email inquiring as to the agreements that would be necessary to allow Raj to reopen the Property ahead of the October 28th meeting. Ex. 24. In that email Raj is referred to as the "new owners." *Id.* In contrast, Cline testified that he thought Hoffman and Breslin were at the October 28, 2014 meeting "representing somebody interested in buying the property." Cline, Tr. 90, Jan. 13, 2020. Cline

also repeatedly denied any knowledge of the bankruptcy auction sale. The Court cannot find with certainty that the Defendants knew about the sale contract.

Second, even if the record established that the Defendants knew that the Raj contract had not yet closed, the Plaintiffs have failed to prove that the Defendants' intentions were to procure Raj's breach of contract. To the contrary, as previously discussed, the record suggests that the Defendants actions were motivated by a desire to force Raj to make repairs to the Thatched Cottage and cure deficiencies in the construction of the bulkhead and the encroachment onto Town property.

Finally, as to damages, the Court finds that Plaintiffs were injured by Raj's breach as they were denied the benefit of the sale and left instead with an obligation, pursuant to this Court's orders, to credit bid. *See* Orders, dated August 11, 2014 and October 16, 2014, Case No. 14-7001, ECF Nos. 201 and 247. Whether the Defendants were the cause of Raj's breach is an issue the Court need not reach because this claim fails due to Plaintiffs' failure to prove that the Defendants intentionally procured Raj's breach of the contract.

Therefore, the Court finds that Plaintiffs have failed to establish the Defendants' liability for tortious interference with contract and judgment will enter in favor of the Defendants on the first cause of action.

### B. Tortious Interference with Prospective Economic Advantage – Second Cause of Action

The second cause of action of the Amended Complaint is for tortious interference with prospective economic advantage. The Amended Complaint alleges the following: Defendants were aware that the placarding had a chilling effect on the Plaintiffs' ability to market the Property, and were aware that the price Plaintiffs could obtain for the Property was substantially

decreased as a result of the placard; Defendants maintained the placard for 17 months, and on March 10, 2016 issued a stop work order at the Property denying Plaintiffs access; Defendants communicated with prospective purchasers and advised them that they would have to lease or license the waterfront property, and spend substantial funds to upgrade the bulkhead and/or retaining wall, all of which negatively impacted the willingness of prospective purchasers to buy at fair market value; certain prospective purchasers cancelled purchaser offers as a result of the placard; it was Defendants' intention to harm Plaintiffs and but for the Defendants' actions the Plaintiffs would have been able to sell the Property sooner than they did. Am. Compl. ¶¶ 101-120.[16]

The Defendants respond that they did not interfere with any specific prospective business relationship; they did not maintain the placard for any improper purpose; and they did not intend to harm the Plaintiffs. Defs.' Pretrial Mem. of Law at 17. Defendants point to the fact that the Plaintiffs succeeded in signing a contract in October 2015 to sell The Thatched Cottage for $4.1 million, which contract only fell through following the death of the purchaser's principal, and that Plaintiffs ultimately succeeded in selling the property in late 2016. *Id.* Additionally, the Defendants argue that the stop work order was not directed at a party with which Plaintiffs sought to have a business relationship, and that the Town allowed work to resume a month later, after receiving the Pacifico Report. *Id.*

To succeed on a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must prove that: (1) the plaintiff had a reasonable expectation of entering into a valid business relationship; (2) the defendant knew of that expectation; (3) the

---

[16]    Although the Amended Complaint does not distinguish, to the extent that this claim relates to the Defendants' interference with Plaintiffs' sale of the Property, these claims are appropriately attributed to BSG, as owner of the Property post-January 2015. Despite this distinction, for ease of reference, the Court will refer to "Plaintiffs" in this section.

defendant purposefully interfered and that interference prevented the business relationship from ripening into a valid business relationship; and (4) the plaintiff sustained damages as a result of the defendant's interference. *See In re Gormally*, 550 B.R. 27, 41 (Bankr. S.D.N.Y. 2016) (citation omitted). A plaintiff's burden under this theory of recovery is often greater than that for a tortious interference with contract claim as a defendant's conduct must tend to be especially culpable. *See Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103-04 (N.Y. 2004). Generally, the defendant's conduct must either "amount to a crime or an independent tort," *Carvel Corp*, 818 N.E.2d at 1103, such as a "prima facie tort" in which case "lawful means are used but the interference is the infliction of intentional harm, resulting in damage, and done without excuse or justification." *Sommer v. Kaufman*, 399 N.Y.S.2d 7, 8 (N.Y. App. Div. 1st Dep't 1977).

As to the first element of the claim, it falls to logic that Plaintiffs had a reasonable expectation of selling the Property. Plaintiffs are not in the business of running a catering facility and typically not interested in owning such property to rent. As to the second element of the claim, it is also reasonable to assume that Defendants knew of Plaintiffs' expectation and intention to sell the Property.

The Plaintiffs' claim fails under the third element. The evidence does not bear out that the Defendants purpose was to interfere with Plaintiffs' sale efforts or that any alleged interference prevented any potential sale. First, the record shows that the Plaintiffs were granted access to the Property to change the locks, inspect the premises, and winterizing the Property within a day of requesting it on January 6, 2015. In addition, Plaintiffs did in fact sign a contract to sell the Property in October 2015 which sale only fell through due to the death of the purchaser's principal. Jones, Tr. 136, Nov. 9, 2021. Further, at trial, Lawrence Jones, Senior Vice President of Lending at BFCU, testified that the Property was marketed to seven potential buyers for use as

a catering hall or restaurant, and that only one of those seven potential buyers had even the slightest interest in the Property. *Id.* at 120-22. One of the buyers considered the Property to be "too big a project" and another called it "one of the worst venues he's ever seen," leading the Court to believe that the lack of interest was a result of the Property's condition rather than the Defendants' conduct. *Id.* 120. While Jones testified that the placard itself is "discouraging to potential buyers, providing a major obstacle to them[,]" he did not testify that the potential purchasers were scared away by the Town or any unreasonable demands made by the Town. *Id.* at 116.

Therefore, the Court finds that Plaintiffs have failed to establish Defendants' liability for tortious interference with prospective business advantage and judgment will enter in favor of Defendants on the second cause of action.

### C. Negligence – Third Cause of Action

The final state law cause of action asserted in the Amended Complaint is for negligence. The Amended Complaint alleges the following: Defendants owed a duty to the Trustee and to the Plaintiffs as "primary intended Contract beneficiary/secured creditor and/or successor owner, to comply with and uphold the laws and regulations and enforce them fairly and with due care;" the placement of the placard was "done without any independent due diligence" or "any level of due or ordinary care" by Defendants; Defendants' "breach of the duty of care owed to Plaintiff(s) was and is the proximate cause of [Raj's] refusal to [close]," and also the Plaintiffs' subsequent "inability to market and sell the [Property] at fair market value;" the Individual Defendants neglected to "perform their respective duties with due care;" and Plaintiffs suffered damages as a result of Defendants' negligence. Am. Compl. ¶¶ 121-132. The Defendants respond that no duty

of care was owed to the Plaintiffs and that, if any duty was owed, it was not a "special duty." Defs.' Pretrial Mem. of Law at 18-19.

To establish a claim for negligence under New York law, a plaintiff must show that: (1) the plaintiff was owed a duty of care, (2) the defendant breached that duty, and (3) damages resulted as a proximate cause of the defendant's breach. *King v. Crossland Sav. Bank*, 111 F.3d 251, 259 (2d Cir. 1997) (citing *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir. 1995); *Solomon v. City of New York*, 489 N.E.2d 1294, 1294-95 (N.Y. 1985) (citation omitted)). The Plaintiffs argue the Defendants owed a duty of care to BFCU, as a secured creditor and the primary intended beneficiary of the sale contract between the Chapter 11 Trustee and Raj, and to BSG, as the successive owner of the Property.

### 1. Duty of Care – Special Duty

New York law imposes a heightened "duty" requirement for a New York municipality or its officers to be held liable for negligence in the performance of governmental functions. Specifically, a plaintiff must show a "special duty" via a "special relationship" to establish the first element of a negligence claim against such a governmental defendant. *Valdez v. City of New York*, 960 N.E.2d 356, 361-65 (N.Y. 2011) (distinguishing the "special duty" requirement in negligence actions against governmental defendants from the "governmental function immunity defense" and clarifying the showing of a "special duty" to be a threshold question); *McLean v. City of New York*, 905 N.E.2d 1167, 1171 (N.Y. 2009). *But see Rodriguez v. City of New York*, 595 N.Y.S.2d 421, 424-25 (N.Y. App. Div. 1st Dep't 1993) (no special duty requirement where a police officer has negligently fired a gun across a crowded street); *Madden v. Town of Greene*, 949 N.Y.S.2d 326, 333-34 (N.Y. Sup. Ct. Chenango Cnty. 2012) (no special duty requirement where a municipality has negligently designed a highway).

Thus, the Plaintiffs' negligence claim fails unless a special relationship existed between the parties.

> A special relationship can be formed in three ways: (1) when the municipality violates a statutory duty enacted for the benefit of a particular class of persons; (2) when it voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty; or (3) when the municipality assumes positive direction and control in the face of a known, blatant and dangerous safety violation.

*McLean*, 905 N.E.2d at 1171 (quoting *Pelaez v. Seide*, 810 N.E.2d 393, 400 (N.Y. 2004)).

### a. Statutory Duty Enacted for the Benefit of a Particular Class.

A special relationship may be formed by statute only if the statute, either explicitly or implicitly, provides for a private right of action against the government. *Mclean*, 905 N.E.2d at 1171 (quoting *Pelaez*, 810 N.E.2d at 400). The Town Code does not provide for a private right of action so the question is whether one may be implied. A private right of action may be implied when "(1) the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) recognition of a private right of action would promote the legislative purpose of the governing statute; and (3) to do so would be consistent with the legislative scheme." *Id.* (quoting *Pelaez*, 810 N.E.2d at 400).

Under the first element for implying a private right of action, courts narrowly define the class of plaintiffs intended to benefit from a statute, requiring that the statute be for the exclusive benefit of a class of individuals. *See*, *e.g.*, *O'Connor v. City of New York*, 447 N.E.2d 33, 36 (N.Y. 1983) (finding gas piping regulations were enacted for the benefit of plaintiffs as members of the community but not as individuals and thus no special relationship existed. "To hold otherwise would be to subject municipalities to open-ended liability of enormous proportions and with no clear outer limits."); *Metz v. State of New York*, 982 N.E.2d 76, 80 (N.Y. 2012) (finding representatives of the decedents and survivors of a tragic Lake George tour boat capsizing could

not recover from the State as the statute regulating public vessels was "clearly designed to protect public safety" but "did not create a duty to particular individuals.").

The Plaintiffs have not pointed to any statutory provision that might be read to create a private right of action against the Defendants. The Town Code's provisions on the placarding of buildings and structures do not exist exclusively for persons with interests in the subject real property - property owners or mortgagees alike. Rather, as in the *O'Connor* and the *Metz* cases, the relevant sections are clearly for the protection of the public at large.

### b. Voluntary Assumption of Duty Generating Justifiable Reliance

For a special relationship to exist based on a government or political subdivision's voluntary assumption of a duty generating justifiable reliance by the plaintiff, each of the following elements must be established:

> (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.

*McLean*, 905 N.E.2d at 1172 (quoting *Cuffy v. City of New York*, 505 N.E.2d 937, 940 (N.Y. 1987)); *see also Garrett v. Holiday Inns, Inc.*, 447 N.E.2d 717, 721-22 (N.Y. 1983).

While all four of the elements must be established, "[t]he 'direct contact' and 'reliance' requirements are particularly important, as they rationally define and limit the class of persons to whom the municipality's 'special duty' extends." *Lauer v. City of New York*, 733 N.E.2d 184, 189 (N.Y. 2000) (citing *Cuffy*, 505 N.E.2d at 940).

The record is devoid of any promises or actions by the Defendants to affirmatively act on behalf of the Plaintiffs as to the decision to placard, the placarding itself, or the failure to remove the placard. For that reason, the Plaintiffs have not shown the Defendants owed them a special duty under this prong of the test.

### c. Positive Direction and Control

The final ground for establishing a special relationship between the government and an injured plaintiff, so as to create a special duty is the government's assumption of positive direction and control in the face of a known, blatant, and dangerous safety violation. *McLean*, 905 N.E.2d at 1171 (quoting *Pelaez*, 810 N.E.2d at 400).

Courts hold that a special relationship between the governmental entity and the plaintiff has been created where a government employee had actual knowledge of the dangerous condition and failed to do anything to make it safe while "directly on hand as the peril heighten[s]." *Smullen v. City of New York*, 268 N.E.2d 763, 766-67 (N.Y. 1971) (upholding finding that city owed a "special duty" where city inspector was at the job site and specifically told the decedent that the job site was safe, despite blatant safety violations). Conversely, where the government is not in immediate control of the dangerous situation, there is no special relationship under this prong. *Pelaez,* 810 N.E.2d at 403 (finding no special relationship because government officials who monitored lead poisoning levels did not assume positive direction and control; rather, landlords/building owners were in immediate control of the abatement process).

Although it may be said that the Town assumed positive direction and control over the Thatched Cottage by placarding the property, the Court cannot find that that was done "in the face of a known, blatant, and dangerous safety violation." *Smullen*, 268 N.E.2d at 765. To the contrary, the Court has already found that there was no imminent harm to the public based on the fact that the Thatched Cottage was closed to the public and fenced at the time of the placarding. Cases applying this element for the most part are addressing negligence claims where the plaintiff has suffered some form of bodily injury as a result of the municipal employee's affirmative control over a dangerous safety violation. In other words there is some link between

the dangerous situation and the injury to the plaintiff. That is not the case here and for this reason this element is inapposite.

The Plaintiffs have failed to prove they were owed a special duty by the Defendants. Therefore, they have failed to prove a necessary element of their negligence claim and judgment will enter in favor of the Defendants on the third cause of action.

## CONCLUSION

This case presented the Court with the need to analyze the competing rights of a municipality to take actions it believed necessary to protect itself from liability and ensure the safety of its citizens, with the rights of the Plaintiffs which rights are engrained in the Constitution of the United States. The legal and equitable arguments are as old as our republic and as new as today's headlines. However, the Court finds that there really is only one answer. Whatever the equitable merits of the Defendants' arguments, they violated the Plaintiffs' fundamental rights. As clearly discussed herein, this cannot be condoned.

For all of these reasons, the Court finds the Town and Defendants Cline and Vacchio are liable for violations of the Plaintiffs' due process rights as asserted in the fourth cause of action of the Amended Complaint. The Plaintiffs' claims for violation of their right to equal protection (fifth cause of action) will be dismissed as against all Defendants as will the state claims asserted in the first, second and third causes of action of the Amended Complaint. All claims against McNally will be dismissed. This represents this Court's decision on liability. The trial will continue as to damages.

**Dated: Central Islip, New York**
**August 11, 2022**

**Robert E. Grossman**
**United States Bankruptcy Judge**